**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel Bernal, husband, individually and on behalf of Kevin Bernal, their minor son, et al.,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>Daewoo Motor America, Inc., a Delaware corporation, et al.,<br><br>　　　　　Defendants. | No. CV09-1502 PHX-DGC<br><br>**ORDER** |

Several motions are pending before the Court in this product liability case. For some of the motions, one or more parties have requested oral argument. After careful review of the parties' extensive briefing (hundreds of pages of materials have been submitted), the Court concludes that oral argument will not aid its decision. The requests for oral argument are therefore denied. *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

Because the factual context pertinent to each motion varies, the Court will address the relevant facts as it discusses each motion. All statements of fact refer to facts as alleged unless the order explicitly notes otherwise.

As a general backdrop, Manual Bernal, his mother-in-law Dolores Pacheco, and his son Kevin Bernal were involved in a rollover accident while driving in Mexico in a Daewoo Leganza. Doc. 32 at 3. Mr. Bernal suffered substantial injuries, including head and spinal trauma. Mrs. Pacheco died. *Id.* Plaintiffs filed an amended complaint on November 17,

1    2009 (Doc. 32), and Defendants filed answers (Docs. 37, 43).  Defendant Daewoo Motor

2    America, Inc. will be referred to as "Daewoo America," and Defendant Daewoo Motor

3    Company, Ltd. shall be referred to as "Daewoo Co."

4    **I.      Motion to Amend.**

5           Plaintiffs move to add Guadalupe Alicia Alvarado Rubio as a named plaintiff.

6    Doc. 170.  It is argued that Ms. Rubio is already named in the complaint as a statutory

7    beneficiary, and adding her as a named plaintiff would avoid needless motion practice.  *Id.*

8    at 5-6.  Defendants do not appear to oppose the request.  Doc. 173.  The Court will grant the

9    motion.

10          Plaintiffs also move to amend the scheduling order and complaint to clarify their

11   theories of liability.  Doc. 170.  Plaintiffs argue that the amendment is required as a result of

12   Defendants' failure to timely disclose a defense, namely the "diving theory" of causation.

13   *Id.* at 5.  Plaintiffs' motion also implies that on the basis of deposition testimony by

14   Defendants' expert Jeffrey Croteau on December 17, 2010, Plaintiffs may have a new,

15   additional, or alternative theory of liability – namely that "the restraint system used in the

16   subject Leganza would not protect a 50th percentile male [such as Plaintiff Manuel Bernal]

17   during a rollover accident."  *Id.* at 4.

18          As Daewoo Co. notes, Plaintiffs' own expert testified in August of 2010 that he

19   expected Defendants to proffer a "diving theory" defense and that he did not agree with the

20   theory.  The expert observed to defense counsel that "you and your team of people from

21   Exponent would try to get into the so-called diving theory and divert away from the roof

22   crush," and that "diving theory is not what I believe is the mechanism of injury in this case."

23   Doc. 173-1 at 4, 6.  Given this testimony, Plaintiffs cannot credibly claim that they first

24   learned Defendants would assert a diving theory in December of 2010.  In addition, defense

25   expert reports were disclosed in October of 2010.  *Id.* at 43-50.  Plaintiffs' reply admits that

26   they learned of the "diving theory" defense by at least that time (Doc. 193 at 3), and yet

27   Plaintiffs did not raise the issue with the Court until after the close of discovery.

28          Rule 16 of the Federal Rules of Civil Procedure requires district judges to enter case

1   management schedules and provides that such schedules "may be modified only for good

2   cause[.]" Fed. R. Civ. P. 16(b)(4); *see Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604,

3   608 (9th Cir. 1992); *Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1062

4   (9th Cir. 2005). Good cause exists when a deadline "cannot reasonably be met despite the

5   diligence of the party seeking the extension." Fed. R. Civ. P. 16 Advisory Comm.'s Notes

6   (1983 Am.); *see Johnson*, 975 F.2d at 609 ("Rule 16(b)'s 'good cause' standard primarily

7   considers the diligence of the party seeking the amendment.").[1]

8          The motion to amend the scheduling order was filed on January 18, 2011 (Doc. 170

9   at 7), four days after fact discovery closed (Doc. 121), one month after the testimony of

10  Defendants' expert Mr. Croteau, more than three months after the diving theory was asserted

11  in Defendants' expert reports, more than five months after Plaintiffs' expert testified about

12  the theory, and, most significantly, more than one year after the deadline set by the Court for

13  amending pleadings (Doc. 24 at 1). The Court's most recent order on case scheduling, issued

14  on November 12, 2010, had specifically advised the parties that "[t]he Court *will not* grant

15  additional extensions." Doc. 121 (emphasis added).

16         Plaintiffs' motion is therefore untimely, and the Court finds that Plaintiffs have failed

17  to show the diligence required under Rule 16's good cause standard. Plaintiffs asserted with

18  some confidence at the initial case management conference that their theories of liability had

19  been fully developed and their experts disclosed. Doc. 173-1 at 60-61. Additional analysis

20  and theory development surely could have occurred between Plaintiffs and their experts

21  before the case management conference or during the 15 months of discovery that followed.

22  The Court is not persuaded that Plaintiffs were unable, through reasonable diligence, to

23  discover all theories of liability during the substantial time allowed for trial preparation in

24  this case. *See* Docs. 24, 53, 121.

25         Plaintiffs argue that Defendants would not be prejudice by the proposed amendment,

26

27         [1] Plaintiffs' reply addresses the liberal amendment standard of Rule 15 (Doc. 193 at
    5), but Rule 16 controls after a case management order has been entered, not Rule 15.
28  *Johnson*, 975 F.2d at 607-608.

1   but prejudice is not the relevant inquiry.  "Although the existence or degree of prejudice to

2   the party opposing the modification might supply additional reasons to deny a motion, the

3   focus of the inquiry is upon the moving party's reasons for seeking modification.  If that

4   party was not diligent, the inquiry should end."  *Johnson*, 975 F.2d at 609 (citation omitted).

5      "As the torrent of civil and criminal cases unleashed in recent years has threatened to

6   inundate the federal courts, deliverance has been sought in the use of calendar management

7   techniques.  Rule 16 is an important component of those techniques."  *Id.* at 611.  "In these

8   days of heavy caseloads, trial courts . . . set schedules and establish deadlines to foster the

9   efficient treatment and resolution of cases."  *Wong*, 410 F.3d at 1060.  "Parties must

10  understand that they will pay a price for failure to comply strictly with scheduling and other

11  orders, and that failure to do so may properly support severe sanctions[.]"  *Id.*  The motion

12  to amend the schedule and amend the complaint – other than the addition of Guadalupe

13  Alicia Alvarado Rubio as a named plaintiff – will be denied.[2]

14  **II.     Plaintiffs' Motion for Partial Summary Judgment.**

15     Plaintiffs move for partial summary judgment on several of Defendants' affirmative

16  defenses.  Doc. 176.  Defendants have filed responses (Docs. 206, 214), and the motion has

17  been fully briefed.  Docs. 176, 177, 206, 214, 242.

18     Daewoo Co. moves to strike Plaintiffs' statement of facts for containing assertions not

19  relevant to the motion for partial summary judgment in contravention of Local Rule 56.1(a),

20  and reiterates some of the arguments made in its motion in limine at Doc. 181.  Doc. 213.

21  Plaintiffs oppose.  Doc. 234.  Daewoo Co. did not file a reply.  Although including more

22  facts than necessary burdens the Court and detracts from the motion, Daewoo Co. cites no

23  law for the proposition that it is grounds for striking the entire statement of facts.  As to the

24  motion-in-limine arguments, the Court will address those arguments later in this order.

25     The Court will now address the merits of Plaintiffs' partial summary judgment

26

27  ───────────────

28      [2] This order does not address whether Defendants will be permitted to assert a "diving theory" at trial.  That issue is not before the Court.

1   motion.  Where the defenses raised by Daewoo Co. and Daewoo America are identical,

2   Daewoo America adopts the response of Daewoo Co. Doc. 206 at 1:24-25. When discussing

3   these defenses, therefore, the Court will cite only to Daewoo Co.'s brief while framing the

4   response as Defendants' joint response.

5       **A.    Legal Standard for Summary Judgment.**

6       A party seeking summary judgment "bears the initial responsibility of informing the

7   district court of the basis for its motion, and identifying those portions of [the record] which

8   it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

9   *Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the evidence, viewed

10  in the light most favorable to the nonmoving party, shows "that there is no genuine issue as

11  to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.

12  Civ. P. 56(c)(2).  Only disputes over facts that might affect the outcome of the suit will

13  preclude the entry of summary judgment, and the disputed evidence must be "such that a

14  reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,*

15  *Inc.*, 477 U.S. 242, 248 (1986).

16      **B.    Failure to State a Cause of Action.**

17      Plaintiffs argue this affirmative defense, raised by both defendants, is unsubstantiated

18  by fact or law.  Doc. 176 at 5.  Defendants agree that the complaint is properly pleaded.

19  Doc. 214 at 5.  The Court therefore will grant judgment to Plaintiffs on this defense.

20      **C.    Misjoinder of Parties or Causes of Action.**

21      Plaintiffs argue this defense, raised by Daewoo Co., has no basis and is not an

22  affirmative defense enumerated in Rule 8(c)(1) or Arizona statutes.   Doc. 176 at 6.

23  Defendant does not oppose. Doc. 214 at 5 n.1. The Court therefore will grant judgment to

24  Plaintiffs on this defense.

25      **D.    Unconstitutionality of Arizona Product Liability Statutes.**

26      Plaintiffs argue this defense, raised by Daewoo Co., fails on several grounds:

27  Defendant did not comply with notice of constitutional challenges under Rule 5.1; the

28  defense is not an affirmative defense enumerated in Rule 8(c)(1) or Arizona statutes; and

1    Defendant cannot make the showing required by the defense.  Doc. 176 at 6-7.  Defendant

2    does not oppose.  Doc. 214 at 5 n.1.  The Court therefore will grant judgment to Plaintiffs on

3    this defense.

4         **E.    Misuse of Product.**

5         Plaintiffs argue that this affirmative defense, raised by both defendants, fails because

6    defendants have not produced evidence of product misuse.  Doc. 176 at 8.  Defendants do

7    not oppose, but ask that the motion be denied if Plaintiffs' argument asserts absence of

8    contributory negligence on the part of Plaintiffs.  Doc. 214 at 5 n.1.  Plaintiffs reply that

9    contributory negligence is not a defense to a strict products liability claim.  Doc. 242 at 3.

10        The Court will grant summary judgment on the product misuse defenses.  Although

11   it appears that Arizona has declined to adopt contributory negligence as a defense in product

12   liability cases, *see Jimenez v. Sears, Roebuck & Co.*, 904 P.2d 861, 864 (Ariz. 1995) ("we

13   have rejected contributory negligence as a products liability defense"), the Court will not rule

14   on that issue because it was raised for the first time in Plaintiffs' reply brief.  "It is well

15   established in this circuit that courts will not consider new arguments raised for the first time

16   in a reply brief."  *Bach v. Forever Living Prods. U.S., Inc.*, 473 F. Supp. 2d 1110, 1122 n.6

17   (W.D. Wash. 2007) (*citing Lentini v. Cal. Ctr. for the Arts*, 370 F.3d 837, 843 n.6 (9th Cir.

18   2004)); *see Gadda v. State Bar of Cal.*, 511 F.3d 933, 937 n.2 (9th Cir. 2007).

19        **F.    State of the Art.**

20        Plaintiffs argue that this affirmative defense, raised by both defendants, fails because

21   defendants cannot make the required showing.  Doc. 176 at 9.  Defendants respond that, with

22   respect to the use of tempered glass in side windows, their expert report details why

23   laminated glass was not advisable.  Doc. 214 at 6.  Defendants also argue that they have

24   introduced evidence that the Leganza exceeds the federal standard for roof strength, that

25   federal standards do not require dynamic rollover testing, and that the National Highway

26   Traffic Safety Administration ("NHTSA") has declined to adopt dynamic rollover testing.

27   *Id.*  Plaintiffs reply that this is not evidence of what the state of the art was at the relevant

28   time because meeting federal standards does not necessarily establish that safer designs or

1    more rigorous tests were not feasible.  Doc. 242 at 3-6.

2           Arizona law provides a complete defense in a products liability action "if the plans

3    or designs for the product or the methods and techniques of manufacturing, inspecting,

4    testing and labeling the product conformed with the state of the art at the time the product

5    was first sold by the defendant."  A.R.S. § 12-683(1).  "'State of the art' means the technical,

6    mechanical and scientific knowledge of manufacturing, designing, testing or labeling the

7    same or similar products that was in existence and *reasonably feasible* for use at the time of

8    manufacture."  A.R.S. § 12-681(10) (emphasis added).  In *Golonka v. Gen. Motors Corp.*,

9    the Arizona Court of Appeals implied that a warning cannot be "state of the art" if it was

10   either not feasible or inadvisable.  65 P.3d 956, 974 (Ariz. App. 2003).

11          Plaintiffs argue that evidence of a technology or process being inadvisable is not

12   relevant to a "state of the art" defense.  Doc. 242 at 5.  Plaintiffs seek to narrow the use of

13   the term "inadvisable" in *Golonka* to products liability actions based on deficient warnings,

14   arguing that "with written warnings, the use of any assemblage of words is conceivably

15   'reasonably feasible.'"  Doc. 242 at 6.  As Plaintiffs acknowledge, however, § 12-681(10)

16   uses the term "reasonably feasible."  In light of *Golonka*, the Court is persuaded that a

17   technology or process which is not, on reasonable grounds, advisable in the manufacture,

18   design, testing, or labeling of a product may raise an inference for the trier of fact that the

19   technology or process does not represent the state of art for the product.  Moreover, although

20   federal standards may not represent the state of the art as to all matters involving vehicle

21   production, Plaintiffs have cited no case for the proposition that federal standards are never

22   state of the art with respect to the defects alleged in this litigation.

23          Defendants have produced a report that may indicate laminated glass is not "effective

24   in mitigating occupant ejection under high severity rollover conditions."  Doc. 215 at 8-9.

25   Defendants have also introduced test results that may indicate the Leganza exceeded federal

26   standards for roof strength.  *Id.* at 9.  In addition, Defendants produced evidence that the

27   NHTSA did not require a dynamic rollover test.  *Id.*  This evidence may show what the

28   "state of the art" is not – i.e., it negates Plaintiffs' assertions about what the state of the art

1    is – and therefore raises a genuine factual issue about whether reasonably feasible

2    alternatives existed with respect to the technologies and processes used by Defendants.

3    Accordingly, the Court will deny summary judgment to Plaintiffs on this defense.  This

4    ruling does not address what "state of the art" jury instruction, if any, should be given at trial.

5    That issue will be addressed with the parties as trial approaches.

6           **G.**     **Collateral Source Payments.**

7           Plaintiffs argue that this affirmative defense, raised by Daewoo Co., fails because the

8    defense as pled does not apply to tort causes of action under Arizona law and Plaintiffs have

9    withdrawn their breach of warranty claim.  Doc. 176 at 9-10.  Defendant does not oppose.

10    Doc. 214 at 5 n.1.  The Court therefore will grant summary judgment to Plaintiffs on this

11    defense.

12           **H.**     **Non-party Liability.**

13           Plaintiffs argue that this affirmative defense, raised by both defendants, fails because

14    defendants failed to timely disclose the identity of the non-parties as required by Arizona

15    law. Doc. 176 at 10-11. Defendants do not oppose. Doc. 214 at 5 n.1. The Court therefore

16    will grant summary judgment to Plaintiffs on this defense.

17           **I.**     **Lack of Reliance.**

18           Plaintiffs argue that this affirmative defense, raised by Daewoo Co., fails because

19    liability for informational defects in a product's design does not turn on reliance by the

20    injured party.  Doc. 176 at 11.  Defendant does not oppose.  Doc. 214 at 5 n.1.  The Court

21    therefore will grant summary judgment to Plaintiffs on this defense.

22           **J.**     **Liability of Co-Defendant.**

23           Plaintiffs argue this affirmative defense, raised by Daewoo America, fails because

24    Defendant has not shown any evidence that Daewoo Co. is solely responsible for the conduct

25    alleged.  Doc. 176 at 11.  Because this defense is not challenged as to Daewoo Co., the Court

26    will disregard Daewoo Co.'s express non-opposition (Doc. 214 at 5 n.1).

27           Daewoo America asserts that it "provided plaintiffs with information that [Daewoo

28    America] did not have any role in manufacturing, design, production, testing, and

1    maintenance" of the Leganza model at issue.  Doc. 206 at 2.  Daewoo America also asserts

2    that it "simply distributed the Daewoo Leganza models to Daewoo dealers throughout the

3    United States."  *Id.*  For support, Daewoo America cites to paragraph 1 of its statement of

4    facts (Doc. 207 at 2:7-12).  *Id.*  The only evidence cited in paragraph 1 is "Exhibit A[:]

5    [Daewoo America's] Answers to Plaintiffs' Interrogatory #6."  Doc. 207 at 2:10-12.  The

6    answer, located at Doc. 206-1 at 5, states in part that "[Daewoo America] did not have any

7    role in manufacturing, design, production, testing, and maintenance of the Daewoo Leganza

8    model.  [Daewoo America] distributed the Daewoo Leganza models to Daewoo dealers

9    throughout the United States."   Plaintiffs reply that Daewoo America has offered no

10   "affirmative proof" of its allegations.  Doc. 242 at 6:18-19.

11          Under Rule 56(c)(1)(A) of the Federal Rules of Civil Procedure, "[a] party asserting

12   that a fact cannot be or is genuinely disputed must support the assertion by: . . . citing to

13   particular parts of materials in the record, including . . . interrogatory answers[.]"  In light of

14   Daewoo America's citation to an interrogatory answer that supports its position opposing

15   summary judgment, the Court finds that Daewoo America has raised a genuine dispute of

16   fact.  Because Plaintiffs' sole argument is lack of evidence, the Court will deny summary

17   judgment to Plaintiffs on this defense.

18          **K.    Assumption of Risk.**

19          Plaintiffs argue that this affirmative defense, raised by Daewoo America, fails because

20   Defendant failed to produce any evidence.  Doc. 176 at 12.  Because the motion challenges

21   only Daewoo America's defense and Daewoo America expressly responds, the Court will

22   assume that Daewoo America does not adopt Daewoo Co.'s response (*cf.* Doc. 206 at 1:25-

23   27).  Therefore, the Court will disregard Daewoo Co.'s response on this issue (Doc. 214 at

24   6-7).

25          Daewoo America argues in part that under Article 18, § 5 of the Arizona Constitution,

26   assumption of risk must always be determined by a jury.  Although the Arizona Constitution

27   provides for a jury trial on such a defense, *Phelps v. Firebird Raceway, Inc.*, 111 P.3d 1003

28   (Ariz. 2005), Arizona courts have held that a court may nonetheless grant summary judgment

on affirmative defenses on which a jury right exists if "there is no genuine issue of material fact for a jury to consider," *Lee v. State*, 242 P.3d 175, 179 & n.2 (Ariz. App. 2010) (listing assumption of risk as one of several fact-based affirmative defenses on which jury rights exist, but that nonetheless can be decided on summary judgment if no genuine disputes exist).  This principle accords with *A Tumbling-T Ranches v. Flood Control Dist. of Maricopa County*, where the Arizona Court of Appeals held that § 5 of the Constitution "does not guarantee a defendant an unqualified right to raise assumption of risk as a defense." 217 P.3d 1220, 1244 (Ariz. App. 2009). *Tumbling-T Ranches* concluded that in order for a jury to receive an instruction on assumption of risk, "a defendant must present evidence showing: (1) a risk of harm to the plaintiff caused by the defendant's conduct; (2) plaintiff's actual knowledge of the risk and appreciation of its magnitude; and (3) plaintiff's voluntary choice to accept the risk given the circumstances."  *Id.* (citing *Hildebrand v. Minyard*, 494 P.2d 1328, 1330 (Ariz. App. 1972)).

Daewoo America asserts that the following evidence makes the requisite showing: "Plaintiffs embarked on a lengthy overnight trip[,] . . . Kevin Bernal was not wearing his seatbelt at the time of this accident . . . [causing him to be] ejected from the vehicle during the rollover[, and] . . . [Mrs. Pacheco] was not properly utilizing her available and functioning seatbelt which, in large part, led to her injuries."  Doc. 206 at 3.  In ruling on a motion for summary judgment, the evidence of the nonmoving party is "to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.  Although Daewoo America's response is somewhat cryptic, the Court, drawing all justifiable inferences in Daewoo America's favor, as it must, concludes that a reasonable jury could find that Plaintiffs faced a risk of harm from not wearing or improperly wearing seat belts, knew of that risk, and chose to accept it when they did not wear or improperly wore their seatbelts.  This issue must therefore be resolved by the jury, and the Court will deny summary judgment.

With regard to Manuel Bernal, however, Daewoo America fails to explain how the overnight nature of the trip would support any inference Mr. Bernal knew and assumed the

1   risk of the vehicle's roof caving in on him, as alleged.  The Court will therefore grant

2   judgment for Plaintiffs as to Manuel Bernal on this defense.

3       **L.    Failure to Mitigate.**

4           Plaintiffs argue that this affirmative defense, raised by Daewoo America, fails because

5   Defendant failed to produce any evidence regarding how Plaintiffs failed to mitigate.

6   Doc. 176 at 12.  Because the motion challenges only Daewoo America's defense and

7   Daewoo America expressly responds, the Court will assume that Daewoo America does not

8   adopt Daewoo Co.'s response (*cf.* Doc. 206 at 1:25-27).  Therefore, the Court will disregard

9   Daewoo Co.'s response on this issue (Doc. 214 at 7-8).

10          Daewoo America argues that the following facts raise a genuine issue for the jury as

11  to Plaintiffs' failure to mitigate:  the accident occurred as part of a lengthy overnight trip, and

12  Mr. Bernal's mother and son did not properly use seatbelts.  Doc. 206 at 3.  Plaintiffs respond

13  that failure to mitigate usually applies to post-injury conduct and no evidence was produced

14  showing Plaintiffs acted unreasonably in mitigating their post-injury damages.  Doc. 242 at 8.

15  Plaintiffs further argue that even if failure to mitigate were synonymous with comparative

16  fault, the defense fails because (1) as to Manuel Bernal's failure to mitigate, no evidence was

17  adduced to support the defense, (2) as to Kevin Bernal's non-use of seatbelt, Daewoo

18  America failed to identify admissible evidence showing how his injuries would have been

19  mitigated if he had used a seatbelt, and (3) as to Mrs. Pacheco, Defendant's expert statement

20  regarding her not being properly belted is just speculation unsupported by competent

21  evidence, and competent evidence shows Mrs. Pacheco was wearing the belt properly.  *Id.*

22          The Court generally has viewed a mitigation of damages defense as applying to

23  actions the plaintiff failed to take after the initial injury occurred.  Arizona law may be broad

24  enough to include pre-injury conduct as well:  "[a] party's failure to mitigate damages may

25  be invoked to negate and reduce damages where the party by its own voluntary activity has

26  unreasonably *exposed itself to damage* or increased its injury."  *Life Investors Ins. Co. of Am.*

27  *v. Horizon Res. Bethany, Ltd.*, 898 P.2d 478, 483 (Ariz. App. 1995) (emphasis added; citation

28  omitted).  Mitigation is, however, distinct from contributory negligence.  *See Reed v.*

1   *Mitchell & Timbanard, P.C.*, 903 P.2d 621, 626 (Ariz. App. 1995) (listing contributory

2   negligence and failure to mitigate damages as distinct reasons for a plaintiff's loss).  The

3   Court will require additional input from the parties on whether, as a matter of Arizona law

4   and the facts of this case, a mitigation of damages defense should be included in the jury

5   instructions in this case.  Assuming for now that it should, the Court will address the parties'

6   evidentiary disputes.

7       The Court fails to see how the lengthy overnight trip affected the damages Manuel

8   Bernal suffered as a result of the allegedly-defective vehicle.  The complaint alleges that

9   "[d]uring their trip, the Vehicle lost control, flipping numerous times."  Doc. 32 at 3:12-13.

10  The complaint also alleges that "[t]he design and manufacture of the Vehicle, including but

11  not limited to its roof, pillars and windows, was defective and unreasonably dangerous."  *Id.*

12  at 6:15-16.  To the extent the complaint alleges the cause of injury to be crashworthiness of

13  the vehicle, a lengthy overnight trip appears irrelevant.  To that extent, the Court will grant

14  judgment to Plaintiffs on the defense of failure to mitigate as to Manuel Bernal.

15      To the extent the complaint also alleges the vehicle's defects caused the crash in the

16  first place, Daewoo America has failed to raise a genuine dispute as to whether Mr. Bernal

17  failed to mitigate damages.  Daewoo America's controverting statement of facts adopts

18  Daewoo Co.'s statement of facts with exceptions not relevant to this issue.  Doc. 207 at

19  1:24-26.  With respect to the failure to mitigate, Daewoo Co. asserts only facts regarding

20  Kevin Bernal and Mrs. Pacheco.  Doc. 215 at 11:17-22.  Daewoo America has failed to show

21  a genuine dispute about how Mr. Bernal's actions unreasonably exposed him to damage or

22  caused injury after the vehicle allegedly lost control.  The Court will therefore grant summary

23  judgment to Plaintiffs on the defense of failure to mitigate as to Manuel Bernal.

24      As to the mitigation of damages sustained by Kevin Bernal and Mrs. Pacheco, the

25  Court finds that a jury question is presented for the same reasons it is presented on

26  assumption of risk, as discussed above.  The Court therefore will deny summary judgment

27  on the mitigation of damages defenses of Kevin Bernal and Mrs. Pacheco.  As noted above,

28  the parties should address in their proposed jury instructions whether a mitigation of damages

1    defense in this case may be based on pre-injury conduct.

2         **M.    Spoliation of Evidence.**

3         Plaintiffs argue that this affirmative defense, raised by Daewoo Co., fails because

4    Defendant failed to produce any evidence that Plaintiffs breached their duty to preserve

5    evidence within their control.  Doc. 176 at 12-13.  It is undisputed that after the accident the

6    vehicle at issue was stored in a police impound yard in Mexico, that a fire occurred at the

7    yard in March of 2008, and that the fire extensively damaged the vehicle.  Daewoo Co.

8    argues that Plaintiffs had control of the vehicle after the accident and that they had the ability

9    to move the vehicle from Mexico so as to preserve it, but failed to do so.  Doc. 214 at 7-8.

10        Daewoo Co. cites to *Souza v. Fred Carries Contracts*, 955 P.2d 3 (Ariz. App. 1997),

11   in support of the proposition that "Plaintiffs breached their duty to preserve the vehicle in its

12   post-accident condition."  Doc. 214 at 8.  In *Souza*, the Arizona Court of Appeals noted that

13   "litigants have a duty to preserve evidence which they know, or reasonably should know, is

14   relevant in the action, is reasonably calculated to lead to the discovery of admissible

15   evidence, is reasonably likely to be requested during discovery and/or is the subject of a

16   pending discovery request."  955 P.2d at 6 (citations and internal quotation marks omitted).

17   In reversing dismissal of plaintiff's case for failure to preserve, the court applied five factors:

18   (1) whether plaintiff "willfully or volitionally destroy[ed] the evidence or even kn[e]w it was

19   going to be destroyed"; (2) whether there was a "failure to comply with a court order [or]

20   abuse of discovery or disclosure procedures or requirements"; (3) whether the defendant "had

21   the right, opportunity, and ability to retrieve and preserve the car if it so chose," (4) whether

22   destruction of the evidence rendered the defendant "completely incapable of mounting a

23   defense or irreparably prejudiced its ability to defend"; and (5) whether the "trial court

24   thoroughly considered other, less severe, sanctions before resorting to the most extreme."

25   *Id.* at 6-7 (internal quotation marks and citations omitted).

26        Daewoo Co.'s response is ambiguous as to whether it asserts the spoliation defense

27   as a means of dismissing the seatbelt defect claims in toto.  *See* Doc. 214 at 8 ("To the extent

28   the Court might determine that Plaintiffs could advance [seatbelt defect claims], Plaintiffs'

1   spoliation of evidence would be a key component of [Daewoo Co.'s] defense."). Defendant

2   does appear, however, to seek a more limited relief such as evidentiary inferences. *Id.*

3       Daewoo Co. does not maintain that Plaintiffs intentionally or volitionally set fire to

4   the impound yard or the car, or that they violated a court order or abused the discovery

5   process. *Id.* at 7-8. Defendant also acknowledges that its experts "have been able to provide

6   detailed opinions to refute Plaintiffs' roof design and side-window glass claims despite the

7   damage to the vehicle," and is unclear about whether the same is true of the seatbelt claims.

8   *Id.* at 8.

9        The factor that may favor Defendant is whether it had the right, opportunity, and

10  ability to retrieve and preserve the car – and was prejudiced in that right by Plaintiffs' action

11  or inaction. Defendant asserts that Plaintiffs' counsel, an experienced product liability

12  attorney who began representing Plaintiffs days after the accident, did not make Defendant

13  aware of the accident or the potential of litigation by the time of the fire, approximately 8

14  months after the accident occurred. Doc. 215 at 10. Plaintiffs do not dispute this assertion,

15  but rather contend that the Mexican police had control of the vehicle and that there is no

16  evidence Mexican police impound yards are dangerous or inherently risky. Doc. 176 at 13;

17  Doc. 242 at 10. Despite being faced with this argument in Plaintiffs' motion, Defendant did

18  not address the issue of whether Mexican police would have released the car prior to the fire

19  even had Defendant been informed and requested it, or that Mexican police impound yards

20  are more dangerous than the yard where Defendant would have stored the car. Doc. 214.

21      On the basis of the facts presented by the parties in their briefing, a spoliation-based

22  dismissal of Plaintiffs' claims clearly is not warranted. Daewoo Co. has presented no

23  evidence that Plaintiffs' counsel intentionally destroyed evidence or had reason to know

24  evidence would be destroyed in the hands of Mexican authorities. To the extent spoliation

25  is presented as a complete affirmative defense to Plaintiffs claims, therefore, summary

26  judgment is granted in favor of Plaintiffs.

27      Daewoo Co. also suggests that an adverse inference jury instruction might be

28  warranted. The Court is doubtful that such an instruction – which would tell the jury that it

1    should or could infer that evidence destroyed in the fire was favorable to Daewoo Co. and

2    unfavorable to Plaintiffs – is warranted in the absence of some culpable conduct on the part

3    of Plaintiffs.  *See Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 520-21 (D. Md.

4    2010) (culpable conduct required for adverse inference instruction); *Rimkus Consulting*

5    *Group, Inc. v. Cammarata*, 688 F.Supp.2d 598, 615-16 (S.D. Tex. 2010) (same).  At the

6    same time, if Plaintiffs are permitted to present a seatbelt-related claim, Daewoo Co. may

7    well be permitted to inform the jury of the circumstances under which evidence related to the

8    seal belt claim was lost.  The Court cannot at this stage determine whether any jury

9    instruction is warranted or whether evidence of the destruction will be relevant to issues at

10   trial.  The grant of summary judgment on the case-dispositive portion of the spoliation

11   defense therefore should not be interpreted as precluding arguments by the parties on these

12   other issues.

13             **N.      Preemption by Federal Law.**

14             Plaintiffs argue this affirmative defense, raised by Daewoo Co., fails because

15   Plaintiffs' product defect claims are not preempted by federal law.  Doc. 176 at 14-16.

16   Defendant responds by incorporating by reference its cross-motion for summary judgment

17   based on this defense.  Doc. 214 at 8.  Plaintiffs reply by incorporating their response to the

18   respective motion.  Doc. 242 at 11.

19             Defendant's preemption argument addresses only claims alleging injuries to Kevin

20   Bernal and Mrs. Pacheco from the use of tempered glass.  Doc. 183.  Because Defendant

21   does not appear to oppose summary judgment on this defense as to any other claims, the

22   Court will grant judgment to Plaintiffs on this defense with respect to all claims other than

23   tempered glass claims.  The Court will address the cross-motion on tempered glass below.

24   **III.   Daewoo Co.'s Motion for Partial Summary Judgment.**

25             **A.      Summary of Arguments.**

26             Daewoo Co. argues that a tort claim under Arizona law for the use of tempered glass

27   in side windows of automobiles is preempted by federal law.  Doc. 183.  More specifically,

28   Defendant asserts that federal safety standard FMVSS 205 ("Standard 205"), the standard

1   for vehicle glass, permits the use of tempered glass, and that none of the amendments to the

2   standard has removed tempered glass as a permissible technology. *Id.* at 5-7. Defendant also

3   points out that although laminated glass is also permissible, the NHTSA has refused to make

4   laminated glass the exclusive standard in part because "laminated glazing would increase the

5   risk of neck injuries to belted occupants" without guaranteeing ejection prevention. *Id.* at 8.

6   In fact, Defendant notes, the new ejection mitigation standard, FMVSS 226, expressly

7   rejected the notion that laminated glass by itself would reliably mitigate ejection in a rollover.

8   *Id.* at 10. Defendant contends that it is entitled to summary judgment on the side-window

9   claims because tempered glass was permissible under federal safety standards and the tort

10  claim is therefore preempted under *Geier v. American Honda Motor Co.*, 529 U.S. 861

11  (2000). Doc. 183 at 10-11. Defendant cites several cases from state courts outside Arizona

12  holding that tort claims are preempted by Standard 205. *Id.* at 13-14. Defendant also argues

13  that the Fifth Circuit erred when it framed Standard 205 as a minimum-threshold material

14  standard in *O'Hara v. General Motors*, 508 F.3d 753 (5th Cir. 2007). Doc. 183 at 15-17.

15          Plaintiffs respond that the existence of multiple options under the federal standard

16  does not preempt their claim under *Geier*, citing in part to the recently-decided case of

17  *Williamson v. Mazda Motor Co. of America*, 131 S. Ct. 1131 (2011). Doc. 223. Plaintiffs

18  also argue that *O'Hara* is good law and that Standard 205 is a non-preemptive, minimum-

19  requirements standard. *Id.* at 10-15. Furthermore, Plaintiffs contend, the NHTSA's

20  decisions in 2002 and 2011 to not mandate the use of laminated glass should not be given

21  retroactive effect so as to preempt conduct by Defendant years prior to the earliest decision.

22  *Id.* at 15-16. Plaintiffs argue, in the alternative, that even if these decisions were retroactive

23  they do not preclude this lawsuit. *Id.* at 16-24.

24          Defendant replies that *Williamson* is not dispositive, that the lawsuit conflicts with the

25  optional compliance framework of Standard 205, and that NHTSA's 2002 and 2011

26  decisions should be given retroactive effect. Doc. 243. Defendant also suggests that failing

27  to find preemption here could result in different states separately finding each of the

28  alternative materials in Standard 205 to be insufficient, thereby eviscerating the federal

standard. *Id.* at 11.  Defendant notes that NHTSA's decision not to mandate laminated glass is rooted in two considerations: (1) cost, and (2) the conclusion that some risk to neck injury is associated with laminated glass.  *Id.*

In sum, the parties do not dispute that Standard 205 is a federal standard promulgated under the National Traffic and Motor Vehicle Safety Act ("Safety Act" or "Act").  They do not dispute that Standard 205 lists both tempered glass and laminated glass among the alternatives.  They also do not appear to dispute that if Standard 205 were merely a "minimum requirements" standard it would not preempt Plaintiffs' claims.  Finally, the parties do not argue that, absent preemption, Defendant will automatically be liable for choosing tempered glass.  The dispositive issue before the Court, then, is whether Congress intended standards like Standard 205 to preempt state lawsuits claiming that a manufacturer was negligent in choosing to use one of the materials permitted by the standard.

## B.     Legal Standards.

The Safety Act was initially codified at 15 U.S.C. § 1381 et seq., and was recodified without substantive change at 49 U.S.C. § 30101 et seq.[3] *Williamson*, 131 S. Ct. at 1134. The purpose of the Safety Act is to "reduce traffic accidents and deaths and injuries resulting from traffic accidents," and standards promulgated under this Act are a means to that end. § 30101.  The Safety Act expressly preempts states from promulgating standards not identical to a federal standard under the Act, § 30103(b)(1), but also expressly provides that compliance with a standard under the Act "does not exempt a person from liability at common law, § 30103(e) ("Saving Clause").  "[T]he presence of the saving clause makes clear that Congress intended state tort suits to fall outside the scope of the express pre-emption clause." *Williamson*, 131 S. Ct. at 1135 (citing *Geier*, 529 U.S. at 868) (internal quotation marks omitted).  "[T]he saving clause does not[, however,] foreclose or limit the operation of ordinary pre-emption principles, grounded in longstanding precedent." *Id.* at 1136 (citing *Geier*, 529 U.S. at 874) (internal quotation marks omitted).

---

[3] When citing to the Safety Act, the Court will reference the recodified sections.

1    Implied preemption occurs when, through the "scheme of federal regulation,"

2    Congress intends to preempt state law. *Gaeta v. Perrigo Pharm. Co.*, 630 F.3d 1225, 1230

3    (9th Cir. 2011) (citing *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707,

4    712-13 (1985)). "Conflict preemption, in turn, arises when: (1) compliance with both federal

5    and state regulations is a physical impossibility, or (2) state law stands as an obstacle to the

6    accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 1231

7    (citing *Automated Med. Labs.*, 471 U.S. at 713) (internal quotation marks omitted). "The

8    conflict might be with a federal statute or an 'agency regulation with the force of law.'" *Id.*

9    (citing *Wyeth v. Levine*, 129 S. Ct. 1187, 1200 (2009)).[4]

10   "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case."

11   *Wyeth*, 129 S.Ct. at 1194 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). "[I]n

12   all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field

13   which the States have traditionally occupied, . . . we start with the assumption that the

14   historic police powers of the States were not to be superseded by the Federal Act unless that

15   was the clear and manifest purpose of Congress." *Id.* at 1194-95 (internal quotation marks

16   and citations omitted; ellipses in original). In determining whether Congress considered a

17   state law not to be an obstacle to federal objectives, a court may take note of Congress's

18   awareness of the law in question together with its decision not to expressly preempt the field.

19   *Cf. Wyeth*, 129 S. Ct. at 1200 ("The case for federal pre-emption is particularly weak where

20   Congress has indicated its awareness of the operation of state law in a field of federal

21   interest, and has nonetheless decided to stand by both concepts and to tolerate whatever

22   tension there [is] between them." (alterations in original; internal quotation marks and

23   citation omitted).

24   **C.    Discussion.**

25   As a threshold matter, the NHTSA's 2011 decision not to adopt laminated glass as the

26

27        [4] Daewoo Co.'s preemption argument appears to rest solely on conflict preemption.
     Doc. 183; Doc. 243 at 2:11-12. The Court will therefore limit its preemption analysis to this
28   theory.

1   exclusive ejection mitigation technology is not dispositive because Defendant does not argue

2   preemption under the standard at issue in that decision – FMVSS 226.  Similarly, although

3   the proposed rulemaking that the NHTSA terminated in 2002 involved ejection mitigation

4   technologies (*e.g.,* 67 Fed. Reg. 41365 (June 18, 2002)), the regulations at issue were not the

5   standard which Defendant argues preempts some of the tort claims here.  The suggestion that

6   NHTSA's findings validated the technical choices Defendant made with respect to the

7   Leganza is not relevant with respect to preemption.  The sole question is whether Standard

8   205 preempts some of Plaintiffs' claims due to an implied conflict between the state tort law

9   in question and the requirements of Standard 205.  Doc. 183 at 2-5.

10      Because the parties agree that both laminated glass and tempered glass are listed in

11   Standard 205, it was clearly not impossible for Defendant to comply with both the standard

12   and state law assuming *arguendo* that a state jury would conclude laminated glass should

13   have been used in the Leganza's side windows.  Therefore, the remaining inquiry is whether

14   such a jury finding would stand "as an obstacle to the accomplishment and execution of the

15   full purposes and objectives of Congress."  *Gaeta*, 630 F.3d  at 1231.

16      As a starting point, the Court notes that Congress was aware of state tort claims

17   against car manufacturers and did not regard such claims as a per se obstacle to achieving the

18   purpose of the Safety Act.  § 30103(e) ("Compliance with a motor vehicle safety standard

19   prescribed under this chapter does not exempt a person from liability at common law.").

20   Moreover, to the extent the purpose of the Safety Act is to "reduce traffic accidents and

21   deaths and injuries resulting from traffic accidents," § 30101, a jury finding that laminated

22   glass would increase safety during rollover crashes would appear to further, rather than stand

23   as an obstacle to, that purpose.  As the Supreme Court recognized in *Geier*, however, a

24   specific standard may be deemed to preempt state tort claims if the history, the agency's

25   contemporaneous explanation, and the agency's current views of the standard indicate an

26   additional regulatory objective to which state tort claims would be an obstacle.  *Williamson*,

27   131 S. Ct. at 1136 (explaining *Geier*).  Maintaining manufacturer choice can be such a

28   preempting objective, *id.*, although the mere existence of choice in a standard is not sufficient

1  to establish the standard had as a "significant objective" the maintaining of manufacturer

2  choice, *id.* at 1136, 1139-40.

3      In *O'Hara*, decided seven years after *Geier*, the Fifth Circuit looked at the "text of

4  [Standard 205], the history of NHTSA regulation in this area, and NHTSA or Department

5  of Transportation statements construing [Standard 205]," as *Geier* requires.  *O'Hara*, 508

6  F.3d at 759.   *O'Hara* concluded that the "text and history [of Standard 205] are

7  straightforward," that "[o]n its face, [Standard 205] is a materials standard that sets a safety

8  'floor' to ensure that the glazing materials used by manufacturers meet certain basic

9  requirements," and that the "text of [Standard 205] differs significantly" from the standard

10  considered in *Geier*. *Id.* at 759-60.  *O'Hara* also observed that the NHTSA commentary on

11  the 2003 update to Standard 205 "identifies the policy goal behind the update as increasing

12  the clarity and usability of the standard," and that "[t]here is no language in the . . .

13  commentary indicating that NHTSA intended to 'preserve the option' of using tempered

14  glass in side windows, or that preserving this option would serve the safety goals of

15  [Standard 205]." *Id.* at 760-61.  The *O'Hara* court engaged in further analysis of NHTSA

16  statements, including those this Court found not dispositive above.[5]  In the end, *O'Hara*

17  found that Standard 205 did not preempt tort claims under Texas law.

18      Defendant argues that *O'Hara* was wrongly decided – not that it is distinguishable,

19  but that it was wrong.  Doc. 183 at 15.  Defendant points to decisions of the West Virginia

20  Supreme Court and the Tennessee Court of Appeals finding that Standard 205 preempts

21  claims under their respective state laws, and acknowledges that the Texas Supreme Court

22  reached the opposite conclusion.  Doc. 183 at 13-14, 16 n.9.  Defendant also cites to a South

23  Carolina Supreme Court decision that has since been vacated and remanded by the United

24  States Supreme Court, *Priester v. Ford Motor Co.*, 131 S. Ct. 1570 (2011), in light of

25  *Williamson*.  Doc. 183 at 14.

26

27

28      [5] Considering the additional NHTSA statements found not dispositive above would not change the Court's conclusion as to the nature of Standard 205.

1    The Court finds the analysis in *O'Hara* to be persuasive.  Standard 205 is a minimum-

2    requirements standard.  In adopting the standard, the NHTSA did not have a significant

3    regulatory objective of preserving manufacturer choice or preempting state-law tort claims.

4    Summary judgment will therefore be entered against Daewoo Co. on the preemption defense.

5    **IV.    Daewoo Co.'s Motion to Exclude Expert Opinions.**

6         **A.    Summary of Arguments.**

7         Defendant Daewoo Co. seeks to preclude Plaintiffs' witness, Byron Bloch, from

8    offering expert opinion testimony regarding automotive glazing and window design or

9    performance.  Doc. 182 at 2.  Defendant argues that Mr. Bloch is not a qualified expert on

10   the subjects about which Plaintiffs would have him testify because he has only a Bachelor

11   of Arts degree in industrial design, is not an engineer, has not obtained a degree or license

12   in engineering, has not been employed by an automobile manufacturer or component supplier

13   to such manufacturer, has never designed a system similar to one about which he is planning

14   to testify, has not published books or peer-reviewed articles on the subject of his testimony,

15   and his entire experience is derived from his litigation consulting business.  *Id.* at 5.

16   Defendant further argues that Mr. Bloch's methodologies are unreliable because he offers

17   vague descriptions of the system he proposes, he does not show how his proposed system

18   would have performed any better during the crash, he cannot identify who would have

19   offered such a system when the Leganza was manufactured, he has performed no testing of

20   his proposed design, and he is unable to say whether the tempered glass in the Leganza broke

21   due to ground impact or due to either of the passengers being propelled against the glass from

22   the inside.  *Id.* at 7-11.

23        Plaintiffs respond with several independent arguments.  First, Plaintiffs argue that Mr.

24   Bloch was found to be a qualified expert witness in other cited cases despite the deficiencies

25   asserted by Defendant.  Doc. 205 at 5.  Second, they argue that an expert witness may acquire

26   his expertise through a broad range of methods, including "knowledge, skill, experience,

27   training, or education" (*id.*) (citing Fed. R. Evid. 702), and that Mr. Bloch's knowledge was

28   accumulated over more than forty years.  *Id.* at 2, 5-6.  Plaintiffs point out that Mr. Bloch has

authored or presented at least four papers regarding automotive glass, has submitted testimony to Congress and testified at congressional hearings, and has taught a seminar on "Auto Safety Design & Vehicle Crashworthiness" at the University of Maryland's College of Engineering.[6]  *Id.* at 6-7.  Third, Plaintiffs argue that Mr. Bloch's methods are reliable because the two designs he identified are unambiguous, he identified six car manufacturers who equipped certain car models with laminated glass around or before the Leganza was manufactured, laminated side windows were tested by studies and Mr. Bloch is permitted to rely on these studies rather than conduct his own testing, and Mr. Bloch's inability to state exactly the reason for the shattering of the tempered glass is of no import because no one could do so absent a camera capturing this particular rollover.[7]  *Id.* at 10-12.

Although acknowledging that by 1965 Mr. Bloch "was actively inspecting and evaluating hundreds of motor vehicle collision accident vehicles as an expert," Defendant replies that Mr. Bloch does not possess sufficient qualifications to testify on the specific subject matter at issue here.  Doc. 230 at 2-3.  Defendant argues that "whatever knowledge Bloch has regarding automotive glazing is based on self-education, and . . . this self-education was acquired largely, if not entirely, for the purposes of testifying in court and did not grow naturally and directly out of research he has conducted independent of litigation." *Id.* at 4.  Defendant takes issue with the fact that Mr. Bloch's publications and presentations feature only his opinions rather than also the research of others, noting that the cases cited

---

[6] Plaintiffs also note that Mr. Bloch has received a Lifetime Achievement Award from the NHTSA and is acknowledged as an auto safety expert in an exhibit at the Museum of American History of the Smithsonian Institution.  Doc. 205 at 7.  Defendant challenges the assertion that the award was given by the NHTSA, contending it was given by the Greater New York Automobile Dealers Association.  Doc. 230 at 6.

[7] Plaintiffs' additional arguments that Defendant failed to address all factors relevant to the admissibility inquiry or that Defendant is attacking Mr. Bloch's conclusions rather than methodologies are groundless.  Doc. 205 at 14.  A defendant has the prerogative to challenge only the factors it chooses and remain silent as to the others, assuming that its action does not mislead the Court.  Nor does the Court construe Defendant's challenge as pertaining solely to the witness's conclusions: his methods for reaching his conclusions have clearly been challenged, as discussed above.

1    by Plaintiffs as recognizing Mr. Bloch's expertise do not involve the use of laminated glazing

2    in preventing ejections.  *Id.* at 4, 5.  With regard to Mr. Bloch's methods, Defendant

3    reiterates that his conclusions were not reached by inspecting the vehicle or accident scene

4    or by conducting an accident reconstruction, and that the material names offered in Plaintiffs'

5    response as constituting the ideal design were not mentioned in Mr. Bloch's earlier reports

6    and depositions.  *Id.* at 8-9.  Defendant also argues that many of the reports and material cited

7    in Mr. Bloch's affidavit opposing the motion to exclude represent new undisclosed material,

8    which Defendant believes bolsters the idea that Mr. Bloch did not rely on this material in

9    reaching his original conclusions.  *Id.* at 8-10.

10              **B.    Legal Standards.**

11              "Preliminary questions concerning the qualification of a person to be a witness . . .

12   shall be determined by the court."  Fed. R. Evid. 104(a).  "If scientific, technical, or other

13   specialized knowledge will assist the trier of fact to understand the evidence or to determine

14   a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or

15   education, may testify thereto in the form of an opinion or otherwise."  Fed. R. Evid. 702.

16   The qualified witness may testify if "(1) the testimony is based upon sufficient facts or data,

17   (2) the testimony is the product of reliable principles and methods, and (3) the witness has

18   applied the principles and methods reliably to the facts of the case."  *Id.*

19              The knowledge of an expert should be "more than subjective belief or unsupported

20   speculation," and "knowledge" generally is "any body of known facts or . . . any body of

21   ideas inferred from such facts or accepted as truths on good grounds."  *Daubert v. Merrell*

22   *Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993) (citation omitted).  "[A]n expert is

23   permitted wide latitude to offer opinions, including those that are not based on firsthand

24   knowledge or observation," and for that reason the expert's opinion should "have a reliable

25   basis in the knowledge and experience of his discipline."  *Id.* at 592 (citing Fed. R. Evid. 702,

26   703).  In determining whether the testimony of a qualified witness is admissible after

27   *Daubert*, a court may consider: (1) "Whether the opinion is based on scientific, technical, or

28   other specialized knowledge"; (2) "Whether the expert's opinion would assist the trier of fact

1    in understanding the evidence or determining a fact in issue"; (3) "Whether the expert has

2    appropriate qualifications – i.e., some special knowledge, skill, experience, training or

3    education on that subject matter"; (4) "Whether the testimony is relevant and reliable";

4    (5) "Whether the methodology or technique the expert uses 'fits' the conclusions (the

5    expert's credibility is for the jury)"; and (6) "Whether its probative value is substantially

6    outweighed by the risk of unfair prejudice, confusion of issues, or undue consumption of

7    time." *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).

8         An expert's testimony may be general or it may involve particular facts of the case

9    before the court. *United States v. Garcia*, 7 F.3d 885, 889 (9th Cir. 1993) ("[I]t was not error

10   for the district court to consider [the expert's] general testimony about the trauma a child may

11   experience from testifying in court in a defendant's presence.").

12        **C.    Discussion.**

13        Defendant asserts that Mr. Bloch has not examined the vehicle and the scene and

14   cannot conclusively speak to the cause of the tempered-glass windows shattering in this case.

15   In addition to the fact that such matters may be explored fully on cross-examination, expert

16   testimony may be generalized and need not be specific to the exact facts of a case. *Garcia*,

17   7 F.3d at 889.  The parties also dispute whether Mr. Bloch did or did not rely on certain

18   material in forming his conclusions.  This argument goes more to the weight than to the

19   admissibility of his opinions. *Hankey*, 203 F.3d at 1168.[8]

20        Defendant suggests that Mr. Bloch's testimony must be categorized as "scientific"

21   because "[t]he Supreme Court [in *Daubert*] has also made clear that the subject of an expert's

22   testimony must be based on scientific knowledge." Doc. 182 at 7:16-18. But *Daubert* noted

23

24        [8] Mr. Bloch's testimony, like the testimony of all experts in this case, will be limited
25   to the opinions, facts, and supporting rationale set forth in his expert report.  As the Court
     cautioned the parties at the outset of this case: "expert reports disclosed under Rule
26   26(a)(2)(B) must set forth 'the testimony the witness is expected to present during direct
27   examination, together with the reasons therefore.'  Full and complete disclosures of such
     testimony are required on the dates set forth above; absent truly extraordinary circumstances,
28   parties will not be permitted to supplement their expert reports after these dates." Doc. 24.

1    that its "discussion is limited to the scientific context because that is the nature of the

2    expertise offered here," and that "Rule 702 also applies to 'technical, or other specialized

3    knowledge.'"  509 U.S. at 590 n.8.  Unlike *Daubert*, which involved expert testimony

4    regarding a chemical substance alleged to cause birth defects, this case involves testimony

5    on the names of manufacturers who used laminated glass designs at the time the Leganza was

6    manufactured, the alleged superiority of laminated glass with respect to passenger ejection,

7    the effects of laminated glass during rollover accidents, the feasibility of laminated-glass

8    designs, and similar matters – some of which may be of an engineering nature.  The Supreme

9    Court has made clear that at least some engineering testimony is not categorized as

10   "scientific."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 146-47 (1999).

11        Mr. Bloch has over forty years of experience evaluating automotive safety issues and

12   testifying in the automotive safety field.  He has authored or presented at least four papers

13   on automotive glass.  In 1998, he presented a paper titled "Advanced Designs for Side Impact

14   and Rollover Protection" at the 16th International Technical Conference on the Enhanced

15   Safety of Vehicles.  Mr. Bloch noted that tempered side window glass lacks a high-

16   penetration-resistant (HPR) butyl plastic layer that absorbs impact forces.  Mr. Bloch

17   evaluated the benefits of laminated glass with reference to crash test studies performed by

18   Carl Clark that demonstrated that glazing reduced head injury levels and occupant ejections.

19   Doc. 205 at 6 (including citations).

20        Mr. Bloch presented a paper entitled "A Systems Approach to Help Ensure Safe Side

21   Impact Protection and Inflatable Airbag Restraint Systems" at the NHTSA Public Meeting

22   on Side Impact Airbags, held April 19, 1999.  In this paper, he identified a lamination similar

23   to the technology used in windshields to help maintain a side window's integrity during

24   rollovers.  He also noted that "side window glass-plastic glazing is now being brought into

25   some production vehicles, and its widespread usage should be encouraged."  *Id.*

26        Mr. Bloch recently authored two articles appearing in Crash Test Technology

27   International.  In "A Shattering Saga," published June 2010, Mr. Bloch explained that "[t]he

28   failure of thin tempered glass to stay intact thus allows the occupant's head, arm, upper torso

1    or whole body to flail outward or be ejected from the vehicle." *Id.* at 7.  He then discussed

2    a safer alternative, known as laminated or "advanced glazing" glass typically consisting of

3    a layer of high-penetration-plastic (HPR) plastic sandwiched between two layers of glass.

4    *Id.* at 7 (including citations).

5         Mr. Bloch was invited to present the keynote lecture at the Auto Glass Replacement

6    Safety Standards annual conference in 2006.  He has submitted testimony or testified

7    personally at U.S. Congressional Hearings and U.S. Department of Transportation Hearings

8    on Motor Vehicle Safety.  He has taught a seminar on "Auto Safety Design & Vehicle

9    Crashworthiness" at the University of Maryland College of Engineering. *Id.*  Although it is

10   true that Mr. Bloch lacks formal degrees in engineering, Rule 702 does not require such

11   degrees and their absence is not an appropriate basis for excluding expert testimony

12   supported by other knowledge and experience.  *United States v. Smith*, 520 F.3d 1097, 1105

13   (9th Cir. 2008) ("[W]e have previously held that an expert need not have official credentials

14   in the relevant subject matter to meet Rule 702's requirements." (citing *Garcia*, 7 F.3d at

15   889-90)).

16        Although Defendant does contend that Mr. Bloch's knowledge is not based on first-

17   hand tests performed by him, and that he never built the type of system he is proposing,

18   experts' qualifications may stem from "knowledge," and "knowledge" generally is "any body

19   of known facts or . . . any body of ideas inferred from such facts or accepted as truths on

20   good grounds." *Daubert*, 509 U.S. at 592-93.  Defendant has not persuaded the Court that

21   Mr. Bloch is so lacking in knowledge or experience in automotive safety generally and

22   automotive glass in particular that he should be precluded from testifying.

23        Defendant devotes considerable effort to arguing that Mr. Bloch's methods and

24   analysis are not sufficiently connected to the facts of the actual accident in this case.  Mr.

25   Bloch's opinions, however, are focused more on the general safety of laminated automotive

26   glass and the general hazard presented by non-laminated side windows like those found in

27   the vehicle in this case.  His opinions are not based solely on his personal *ipse dixit*, as

28   Defendant would suggest, but are based on industry studies and standards he cites in support.

Certainly the fact that Mr. Bloch cannot tie his opinion to precise details in this case will be fair ground for cross-examination, but the Court cannot conclude that his testimony fails altogether to satisfy the requirements of Rule 702. If Defendant believes during trial that any specific opinion lacks foundation, Defendant may object and the Court will rule on the basis of the foundation laid for the opinion by Mr. Bloch's testimony.

"In serving its gatekeeping function, the court must be careful not to cross over into the role of factfinder. It is not the job of the court to insure that the evidence heard by the jury is error-free, but to insure that it is not wholly unreliable." *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 928 (W.D. Wis. 2007). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595. Defendant's motion to exclude the testimony of Mr. Bloch will be denied.

**V.    Daewoo Co.'s Motion to Limit Rebuttal Witnesses and Testimony.**

Daewoo Co. moves to limit the presentation of Plaintiffs' experts Michael Braun and Joseph Burton by seeking to preclude them from testifying in Plaintiffs' case-in-chief, permit them to testify in rebuttal only after Defendant's case-in-chief, and permit them to testify only on the specific areas actually presented by Defendant's experts. Doc. 181. Plaintiffs respond that their witnesses may testify during their case-in-chief to rebut any of Defendant's experts Plaintiffs may themselves call.[9] Doc. 204.

The Court's Case Management Order made clear that rebuttal expert witnesses are just that – rebuttal witnesses. It stated that "[r]ebuttal experts shall be limited to responding to opinions stated by initial experts." Doc. 24 at 2. As a result, Plaintiffs may use Michael Braun and Joseph Burton only as rebuttal witnesses in this case. Plaintiffs suggest that they may seek to present some defense expert testimony during their case in chief, in which event

---

[9] Plaintiffs' suggestion that some of Defendant's defense theories should be stricken for non-disclosure in the answer (Doc. 204 at 8:9-10) does not constitute a properly-raised motion in limine.

they will seek to present the rebuttal witnesses during their case in chief as well.  Whether Plaintiffs will be permitted to do so will be a matter of trial management to be addressed by the Court and the parties at the final pretrial conference.  Whenever they testify, however, Michael Braun and Joseph Burton will be limited to rebutting opinions expressed by defense experts and to testimony disclosed in their expert reports.

Plaintiffs suggest that Michael Braun and Joseph Burton should be permitted to testify freely, that Defendants will not be prejudiced by such testimony, and that there remains ample time before trial for Defendants to prepare for such testimony.  These arguments ignore the Court's scheduling order.  Rule 16 requires district judges to enter case management schedules and provides that such schedules "may be modified only for good cause[.]" Fed. R. Civ. P. 16(b)(4); *see Johnson*, 975 F.2d at 608.  "Good cause" exists when a deadline "cannot reasonably be met despite the diligence of the party seeking the extension." Fed. R. Civ. P. 16 Advisory Comm.'s Notes (1983 Am.).  Thus, "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment." *Johnson*, 975 F.2d at 609; *see also Coleman*, 232 F.3d at 1294; *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002).  Plaintiffs have not shown that they were unable to meet the initial expert disclosure deadline through an exercise of reasonable diligence.  They therefore have not shown good cause for the Court to extend the expert discovery schedule and permit additional expert discovery between now and trial.

**VI.    Plaintiffs' Motion for Sanctions.**

Plaintiffs move for sanction against both defendants for failure to comply with Rule 30(b)(6) and discovery demands.  Doc. 187.[10]  Daewoo America and Daewoo Co. oppose (Docs. 210, 212), and Plaintiffs filed a reply (Doc. 225).  The Court will address the arguments and responses as to each defendant separately below.

---

[10] Plaintiffs' motion at Doc. 187 contains certain redacted portions, and Plaintiffs have filed an unredacted version as a sealed motion at Doc. 200.  Because responses and the reply have been linked to the non-sealed motion at Doc. 187, the Court will cite to the latter in its order.  The Court need not cite to the redacted material, and therefore this order has not been sealed.

1

### A.    Sanctions as to Daewoo Co.

2    Plaintiffs assert that Daewoo Co. limited its designated witness to post-design

3  information and failed to provide evidence regarding the design of the Leganza, contrary to

4  the Rule 30(b)(6) notice issued by Plaintiffs.  Doc. 187 at 2.  Plaintiffs argue that Daewoo

5  Co. knew it would be defending product liability lawsuits and therefore had a duty to retain

6  documents.  *Id.* at 6.  Plaintiffs urge that Daewoo Co.'s sale of certain assets to GM Daewoo

7  Auto and Technology Company ("GMDAT") does not relieve Daewoo Co. of the

8  responsibility to retain and provide the relevant materials in this litigation.  *Id.* at 2-3.

9  Plaintiffs point out that some testing documents have been disclosed even though they had

10  been described as "GMDAT documents."  *Id.* at 5.  Plaintiffs seek three sanctions: (1) a jury

11  instruction to the effect that Daewoo Co.'s failure to produce the evidence "gives rise to an

12  inference that the content of the evidence is unfavorable to its position"; (2) a ruling

13  precluding Daewoo Co. "from introducing any evidence regarding the reasons for the design

14  choices it made for the Leganza"; and (3) a ruling precluding Daewoo Co.'s experts from

15  "speculating about why cheaper, unsafe design choices may have been made."  *Id.* at 14-15.

16    Substantively, Daewoo Co. responds that it repeatedly informed Plaintiffs' counsel

17  it lacked possession or control over the information at issue, that Daewoo Co.'s ability to

18  provide information was at GMDAT's discretion, that Plaintiffs failed to obtain the

19  information from GMDAT, that Daewoo Co. provided Plaintiffs with the information it

20  received from GMDAT, and that Daewoo Co. should not be sanctioned for Plaintiffs'

21  discovery decisions.  Doc. 212 at 2.  Procedurally, Daewoo Co. points out that this Court

22  admonished the parties that discovery motions should be brought prior to expiration of

23  discovery deadlines, that this motion was filed almost two weeks after the deadline, that

24  Plaintiffs failed to request a  telephone conference prior to filing the motion, that Plaintiffs

25  failed to provide a statement of counsel as required by Local Rule 7.2(j), and that the motion

26  should have been brought as soon as Plaintiffs became aware the material was not

27

28

1    forthcoming.[11]   *Id.* at 3, 9.   Daewoo Co. also notes that the sale to GMDAT was made

2    pursuant to a bankruptcy proceeding, that a Korean court approved the sale agreement, and

3    that the relevant documents were transferred to GMDAT in 2002 – well before Plaintiffs'

4    complaint in 2009.  *Id.* at 15.

5         Plaintiffs' Rule 30(b)(6) argument asserts that the witness designated by Daewoo Co.,

6    Mr. Ko, was not as knowledgeable about the design of the Leganza as Mr. Lee, an engineer

7    who worked on the design and now is employed by GMDAT.   But Daewoo Co. was not

8    obligated to produce the most knowledgeable witness under Rule 30(b)(6), only a witness

9    prepared and qualified to testify on the subjects identified in the Rule 30(b)(6) deposition

10   notice.   Plaintiffs quote at some length from the deposition of Mr. Ko, but the quoted

11   excerpts serve only to show that Mr. Lee has knowledge of the design, not that Mr. Ko's

12   knowledge was insufficient to satisfy Rule 30(b)(6).  Plaintiffs identify few if any questions

13   Mr. Ko was unable to answer, and generally fail to show that Mr. Ko was unprepared to

14   serve as a Rule 30(b)(6) deponent. Doc. 200 at 8-11.  They therefore have failed to show that

15   Daewoo Co. should be sanctioned for failure to comply with Rule 30(b)(6).

16        Moreover, Mr. Ko was deposed on December 14, 2010.  Doc. 200-17 at 2.  Plaintiffs

17   do not explain why they failed to contact the Court during the month of discovery that

18   remained after Mr. Ko's deposition (discovery closed on January 14, 2011 (Doc. 121)) if they

19   thought his answers were insufficient.   The Court could have compelled more complete

20   answers if warranted.  Nor do Plaintiffs explain why they waited more than one year to take

21   the Rule 30(b)(6) deposition on key issues in this case (the original Case Management Order

22   was entered on October 19, 2009 and authorized the commencement of discovery (Doc. 24)).

23   Finally, Plaintiffs do not explain why they failed to depose Mr. Lee if they thought him to

24   be the most knowledgeable witness on the Leganza's design.  In short, the Court concludes

25

26        [11] Daewoo Co. further notes that Plaintiffs' counsel had notice of the sale to GMDAT
27   as a result of Daewoo Co. having interviewed counsel's firm for possible representation in
     another case.  The Court fails to see how discussions with counsel in an unrelated case prior
28   to Plaintiffs' representation having commenced are relevant to Plaintiffs' rights here.

1   that Plaintiffs had ample opportunity to obtain the information they needed in the substantial

2   time allotted for discovery in this case, even if the Court's intervention was required.  Having

3   failed to do so, and having failed to raise any alleged deficiencies in the 30(b)(6) deposition

4   during the time when something could have been done to correct them, the Court concludes

5   that Plaintiffs have not shown they are entitled to sanctions for Daewoo Co.'s alleged failure

6   to comply with Rule 30(b)(6).

7          Plaintiffs' request for spoliation sanctions is even less substantial.  To obtain sanctions

8   for spoliation of evidence, including an adverse inference instruction, Plaintiffs must show

9   that Daewoo Co. had control over evidence and an obligation to preserve it, that the evidence

10   was destroyed with a culpable state of mind, and that the evidence was relevant to Plaintiffs'

11   claim such that a reasonable trier of fact could find it would support that claim.  *Victor*

12   *Stanley*, 269 F.R.D. at 520-21; *Rimkus Consulting*, 688 F.Supp.2d at 615-16.

13          Plaintiffs fail to show that Daewoo Co. had control over the allegedly destroyed

14   evidence.  Although Plaintiffs allege that an agreement between Daewoo Co. and GMDAT

15   gave Daewoo Co. the duty to preserve documents for three years after 2002 and the

16   contractual right to obtain documents from GMDAT thereafter, they fail effectively to

17   counter Daewoo Co.'s evidence that the documents no longer are in its possession.

18          Plaintiffs also fail to show that Daewoo Co. had an obligation to preserve documents.

19   Plaintiffs argue that Daewoo Co. generally knew that product liability litigation could arise

20   with respect to the Leganza, but they fail to identify any specific event from which Daewoo

21   Co. knew or should have known that it would be sued over the roof design issues alleged in

22   this case, a lawsuit brought in 2009, well after the GMDAT transaction in 2002.

23          Moreover, Plaintiffs fail to show that Daewoo Co. destroyed any evidence, much less

24   that it did so with a culpable state of mind.  Plaintiffs argue that "*if*" Daewoo Co. "failed to

25   preserve or destroyed material evidence, Plaintiffs are entitled to sanctions."  Doc. 200 at 14;

26   *see also id.* at 13 ("sanctions for spoliation of evidence will be warranted *if* it is revealed that

27   [Daewoo Co.] failed to preserve evidence") (emphasis added).  But Plaintiffs present no

28   evidence of actually destroyed evidence, nor of Daewoo Co.'s culpable state of mind.

1    Finally, Plaintiffs never address why they failed to seek discovery from GMDAT.

2    Daewoo Co. advised Plaintiffs of the existence of GMDAT and its documents early in the

3    discovery period, and Plaintiffs never explain why they failed to conduct discovery that

4    would have produced the information they now complain is lacking.

5        In short, Plaintiffs have utterly failed to provide the proof needed for an award of

6    sanctions under Rule 30(b)(6) or for spoliation of evidence.

7        **B.    Sanctions as to Daewoo America.**

8        Plaintiffs' argument with respect to Daewoo America is limited to a few sentences in

9    the sanctions motion.  Plaintiffs assert that their Rule 30(b)(6) notice sought information

10   regarding Daewoo America's involvement with "design, testing, product safety analysis,

11   marketing, distribution, sale, maintenance and issues that involve the Daewoo Product

12   Knowledge Training Manual," and that Daewoo America failed to designate a witness

13   prepared to address these issues.  Doc. 187 at 3.  Plaintiffs assert that Daewoo America has

14   not conducted a reasonable investigation into whether the Product Manual was produced by

15   Daewoo America, and its 30(b)(6) witness did not even look at the manual prior to the

16   deposition.  *Id.* at 12.  Plaintiffs seek as a sanction a ruling that the Product Manual is

17   authentic.  *Id.* at 15.

18       Daewoo America responds that its 30(b)(6) witness did look into whether the manual

19   was produced by Daewoo America and was unable to confirm that it was.  Daewoo America

20   quotes statements from the 30(b)(6) deposition to support this fact.  Doc. 210 at 3.  Plaintiffs

21   do not dispute this assertion.

22       Moreover, Plaintiffs did not notice the Rule 30(b)(6) deposition until October 19,

23   2010 (Doc. 87), one year after the start of discovery (Doc. 24).  As a result, little time

24   remained in the discovery period when the deposition was completed on December 31, 2010.

25   Even then, Plaintiffs failed to raise any issue with the Court regarding alleged deficiencies

26   in the deposition during the final two weeks of the discovery period.  Plaintiffs have not

27   shown that they are entitled to sanctions with respect to the Rule 30(b)(6) deposition.

28

**IT IS ORDERED:**

1.      Plaintiffs' motion to amend (Doc. 170) is **granted in part and denied in part** as stated above.  Guadalupe Alicia Alvarado Rubio is added as a plaintiff in this case.

2.      Daewoo Co.'s motion to strike (Doc. 213) is **denied**.

3.      Plaintiffs' motion for partial summary judgment (Doc. 176) is **granted in part and denied in part** as stated above.

4.      Daewoo Co.'s motion for partial summary judgment (Doc. 183) is **denied**.

5.      Daewoo Co.'s motion in limine with regard to expert witness Byron Bloch (Doc. 182) is **denied**.

6.      Daewoo Co.'s motion in limine with regard to expert witnesses Michael Braun and Joseph Burton (Doc. 181) is **granted in part and denied in part** as stated above.

7.      Plaintiffs' motion for sanctions (Doc. 187) is **denied**.

8.      The Court will schedule a final pretrial conference by separate order.

DATED this 2nd day of June, 2011.

_____
David G. Campbell
United States District Judge

- 33 -