**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Manuel Bernal and Paula Bernal, husband and wife, et al.,

               Plaintiffs,

vs.

Daewoo Motor America, Inc., a Delaware corporation, et al.

               Defendants.

No. CV09-1502-PHX-DGC

**ORDER SETTING TRIAL**

A Final Pretrial Conference was held on August 26, 2011. Counsel appeared on behalf of Plaintiffs and Defendants. On the basis of the parties' written submissions and the hearing,

**IT IS HEREBY ORDERED:**

1.      Trial in this matter shall begin on **April 10, 2012** at **9:00 a.m.**

2.      The trial shall last **12 days** (April 10-13, 17-20, and 24-27, 2012). Plaintiffs shall be allotted **36** hours of trial time and Defendants shall be allotted **30** hours of trial time. The Court will keep track of each side's time. Opening and closing statements, direct examination, and cross-examination shall be counted against the parties' allotted time.

3.      A final conference shall be held on **March 20, 2012 at 4:30 p.m.** in Courtroom 603, Sandra Day O'Connor Federal Courthouse, 401 West Washington Street, Phoenix, Arizona 85003. Out-of-state counsel may participate by telephone.

4.     The parties' proposed final pretrial order was approved by the Court as the final pretrial order in this case.  The order shall govern the presentation of evidence and other trial issues, and, pursuant to Rule 16(e) of the Federal Rules of Civil Procedure, shall be modified only to prevent manifest injustice.  Evidence, objections, legal arguments, and relief not requested or identified in the order shall not be available at trial, except to prevent manifest injustice.

5.     The Court has considered Defendant Daewoo Motor Company, Ltd.'s ("DWMC") motion in limine no. 1.  Doc. 273.  The motion will be **denied**.  DWMC generally asks the Court to preclude Plaintiffs' expert Byron Bloch from offering opinions or testimony on biomechanics, but fails to identify specific opinions that are the subject of its motion.  DWMC's motion does not comply with the Court's order requiring that "[e]ach motion in limine shall include proposed language for the order in limine being sought from the Court, and the proposed language shall state with precision the evidence that is subject to the proposed order and the limitation or exclusion placed on the evidence."  Doc. 245 at 2.  As Plaintiffs concede, "Mr. Bloch is not a medical doctor and will not attempt to testify as one."  Doc. 299 at 1.  Whether particular opinions offered by Mr. Bloch are admissible must be ruled on during the course of his testimony and in response to objections by DWMC.  Mr. Bloch's testimony, like the testimony of all experts in this case, will be strictly limited to the contents of his timely expert report.

6.     The Court has considered DWMC's motion in limine no. 2.  Doc. 274.  The motion asks the Court to preclude Byron Bloch from offering any expert opinions that were not stated in timely expert reports.  The Court's Case Management Order made clear that Plaintiffs were required to provide "full and complete expert disclosures as required by Rule 26(a)(2)(A)-(C) of the Federal Rules of Civil Procedure" by the deadline established by the Court.  Doc. 24 at 2.  The Case Management Order further explained: "As stated in the Advisory Committee Notes to Rule 26 (1993 Amendments), expert reports disclosed under Rule 26(a)(2)(B) must set forth 'the testimony the witness

is expected to present during direct examination, together with the reasons therefore.' Full and complete disclosures of such testimony are required on the date set forth above; absent truly extraordinary circumstances, parties will not be permitted to supplement their expert reports after these dates." *Id*. at 3.

The Court normally would hold the parties to this requirement, but it is clear from the materials submitted by the parties that defense counsel asked Dr. Bloch questions during his depositions that allowed him to expand upon his expert reports. *See*, *e.g.*, Doc. 345-4. Defense counsel could have limited their depositions and required Dr. Bloch to stand on his reports, but they instead allowed him to expand his explanations and opinions. To the extent defense counsel chose to do so, they clearly were on notice of his opinions and explanations, and the Court would find it unfair to hold that Dr. Bloch could not restate them. As a result, Dr. Bloch will be permitted to testify at trial about opinions stated in his timely disclosed expert reports and elicited by defense counsel during his depositions. DWMC's motion is **denied**.

7. The Court has considered DWMC's motion in limine no. 3. Doc. 275. The motion argues that Byron Bloch should be precluded from offering accident reconstruction testimony, but does not identify precise opinions that are the subject of the motion. As explained above, Dr. Bloch's testimony will be limited to opinions stated in his timely-disclosed expert reports and elicited by defense counsel in his depositions. DWMC's motion is **denied**.

8. The Court has considered DWMC's motion in limine no. 4. Doc. 276. The motion argues that Plaintiffs should be precluded from presenting any evidence or testimony regarding seatbelt design, defects, or performance. Specifically, the motion asserts that no such testimony was included in any timely-disclosed expert report.

Following the final pretrial conference, Plaintiffs provided excerpts from the rebuttal report of Dr. Burton. Doc. 345, Ex. 1. The report does not assert that the seatbelts were defectively designed. Rather, it assumes the belts operated properly and

therefore finds the injury theories of the defense experts improbable. During Dr. Burton's deposition, defense counsel had him expand on this analysis, an expansion he will be permitted to give at trial. Thus, Dr. Burton will be permitted to express opinions stated in his expert report and deposition during Plaintiffs' rebuttal case.

Plaintiffs also provided the rebuttal report of Dr. Bloch dated November 12, 2010. Doc. 345, Ex. 3. The report was timely. Doc. 53. The report does assert, albeit briefly, that the seatbelts in the vehicle were defective. Defense counsel had Dr. Bloch expand on this analysis during his deposition on January 13, 2011. Doc. 345-4 at 1-8. Dr. Bloch will be permitted to give the opinions stated in his report and elicited by defense counsel in his deposition. DWMC's motion will be **denied**.

9. The Court has considered DWMC's motion in limine no. 5. Doc. 277. DWMC asks the Court to preclude Plaintiffs from calling defense experts during Plaintiffs' case-in-chief, to be followed by testimony from Plaintiffs' rebuttal experts. DWMC argues that such a tactic allows Plaintiffs to get their rebuttal experts into their case-in-chief through a "back door" technique that is inconsistent with the Court's Case Management Order. After hearing arguments at the final pretrial conference and considering the issue carefully, the Court will **grant** the motion. Plaintiffs' accident reconstruction experts were disclosed only as rebuttal witnesses in response to defense experts. Permitting these rebuttal experts to testify during Plaintiffs' case in chief would not be fair when the defense experts have not been permitted to state the full opinions that are being rebutted. Perhaps recognizing this fact, Plaintiffs' counsel stated during the final pretrial conference that they would be willing to permit the defense experts to testify in full during Plaintiffs' case in chief, to be followed by testimony from Plaintiffs' rebuttal experts. Although this would avoid the problem of permitting rebuttal testimony when the testimony it is rebutting has not been presented to the jury in full, it would force Defendants to present a key portion of their defense out of order and out of context. The Court cannot conclude that Defendants should be forced to do so when the problem has

arisen from the fact that Plaintiffs did not disclose accident reconstruction experts until rebuttal reports were due.  The Court concludes that the fairest result is to hold the parties to the order in which they chose to disclose their experts.  Plaintiffs will be permitted to present the experts they disclosed in initial reports during their case in chief, Defendants will be permitted to present defense experts during their case in chief, and Plaintiffs will be permitted to present their rebuttal experts during their rebuttal case.  Plaintiffs will not be permitted to call their rebuttal experts during their case in chief.

10.    The Court has considered DWMC's motion in limine no. 6.  Doc. 278.  The motion seeks to preclude Plaintiffs from playing the videotaped deposition testimony of defense experts during Plaintiffs' case-in-chief.  The Court cannot at this time conclude that any videotape presentation of defense experts during Plaintiffs' case in chief would be inappropriate, and therefore will **deny** the motion.  Consistent with the ruling in the preceding paragraph, however, presentation of such videotape testimony will not permit Plaintiffs to call their rebuttal experts during their case in chief.

11.    The Court has considered DWMC's motion in limine no. 7.  Doc. 280.  The motion seeks to exclude introduction of Dolores Pacheco's autopsy photographs. Plaintiffs respond that they do not intend to introduce autopsy photographs unless necessary to show the nature of her injuries that are unclear from review of the autopsy report and diagram and to rebut defense expert opinions as to the cause of her injuries. Doc. 305.  The Court cannot rule on this issue now.  Whether the photographs will be relevant at trial will depend on evidence presented during the course of trial.  The Court notes its initial inclination to preclude the photographs as they do not appear relevant to the crashworthiness issues in this case, and the cause of Mrs. Pacheco's death – partial ejection from the vehicle – is not disputed.  But because the Court cannot conclude at this point that the photographs would be irrelevant or inflammatory in all events, DWMC's motion will be **denied**.  Plaintiffs should not display the photographs to the jury before obtaining the Court's ruling that the photographs are admissible.

12.     The Court has considered DWMC's motion in limine no. 8.  Doc. 281.  The motion argues that any evidence of Dolores Pacheco's cancer treatment, or the fact that she had "beaten cancer," should be excluded from trial.  Plaintiffs argue that the evidence is relevant to the damages suffered by Mrs. Pacheco's statutory beneficiaries – that it illustrates the loving and self-sacrificing relationship Mrs. Pacheco had with her family.  The motion will be **denied**.  The Court concludes that Mrs. Pacheco's time spent with family is relevant to the jury's understanding of Mrs. Pacheco's relationship with her family, the loss of which gives rise to a portion of Plaintiffs' damages claim.  The Court will not permit Plaintiffs to emphasize Mrs. Pacheco's cancer in order to evoke sympathy from the jury, but neither will it preclude the mention of cancer as part of the natural process of explaining Mrs. Pacheco's relationship with her family.

13.     The Court has considered DWMC's motion in limine no. 9.  Doc. 282.  The motion asks the Court to exclude opinion testimony and documentation from Mexican highway patrol officers regarding any type of accident reconstruction.  The motion does not seek to exclude the personal observation of the officers at the scene or testimony related to actual measurements they may have taken.  Plaintiffs' response agrees that portions of the officers' accident report and testimony should be precluded, but argues that testimony properly within Federal Rule of Evidence 701 should be permitted.  This is a matter the Court must resolve at trial.  Rule 701 permits lay witnesses not only to give factual testimony, but also to express opinions or inferences that are rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.  Rule 701 makes clear that lay witnesses may not provide opinions based on scientific, technical, or other specialized knowledge within the scope of Rule 702.  Clearly, the officers will be permitted to testify concerning their observations at the scene.  Whether they may testify concerning opinions based on their observations will depend on whether those opinions are rationally based on the perception of the witness and helpful to a clear understanding of the testimony, and

whether the opinions are based on scientific, technical, or other specialized knowledge. The Court must rule on these issues as the officers testify. DWMC's motion in limine is **denied**.

14. The Court has considered DWMC's motion in limine no. 10. Doc. 283. DWMC argues that the Court should exclude an April 2001 Product Knowledge Training Manual produced by Plaintiffs in this case. DWMC argues that no witness has testified that the Manual was created by either Defendant. DWMC also argues that the Manual is irrelevant and constitutes hearsay. Plaintiffs respond that the earmarks of authenticity contained in the Manual itself satisfy the requirements of Rule 901.

Rule 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). This evidence can include "[a]ppearance, contents, substance, . . . or other distinctive characteristics, taken in conjunction with the circumstances." *Id.* at 901(b)(4). The proof may consist entirely of circumstantial evidence; direct proof of authenticity is not required. Vol. 5, J. Weinstein & M. Berger, *Weinstein's Federal Evidence,* § 901.03[8] (Matthew Bender 2d ed. 2008). The contents, appearance, or subject matter of a writing can constitute circumstantial evidence of a writing's authorship. *Id.* at § 901.04[3][a].

In this case, the Manual bears Daewoo's logo, is professionally prepared, and contains extensive and detailed information about the vehicle at issue in this case and two related vehicles – information likely not known so comprehensively outside of Daewoo. The Manual states that it was created by or for Daewoo Motor America, Inc. ("Daewoo America"), and apparently contains Daewoo America's correct business address. In addition, the fact that Daewoo ultimately went out of business explains why current representatives of the two Defendants in this case may not be familiar with the manual. Indeed, counsel for Daewoo America stated during the final pretrial conference that Daewoo America had only four employees when it was asked to authenticate the Manual.

Given the internal indicia of authenticity in the Manual and the not-surprising fact that Defendants presently are unable to confirm its production, the Court concludes that Plaintiffs have satisfied the Rule 901(a) burden of presenting evidence sufficient to support a finding that that Manual is what Plaintiffs claim – a marketing brochure created by Defendants, or with information provided by Defendants, about the vehicle at issue in this case.  The Court therefore will **deny** the motion in limine to the extent it asserts that the Manual lacks a sufficient evidentiary foundation.

The Court will also deny Defendants' hearsay objection.  Plaintiffs have indicated that they do not seek to introduce the Manual to prove the truth of the matters it asserts, but instead to show that Daewoo America knew more about the design and performance of the vehicle than it now admits, and to show that DWMC made inconsistent claims about the level of testing performed on the vehicle.  Defendants may seek a limiting instruction that the Manual is not being admitted to prove the matters it asserts.

The Court concludes that the Manual is relevant to the claim against Daewoo America and is not precluded by Rule 403.  Daewoo America will have a full opportunity to explain why the jury should not accept the Manual as authentic or, if it does, to show why the Manual does not establish Daewoo America's knowledge of product defect.

The Court is less certain on whether the Manual is relevant against DWMC.  Plaintiffs explained during the final pretrial conference that the Manual is relevant because it contains claims about vehicle testing that are inconsistent with positions taken by DWMC in this case – it states that more tests were performed, and were performed to higher standards, than DWMC has stated in this case.  Plaintiffs argue that the manual therefore goes to the overall credibility of DWMC's claims in this case.  Plaintiffs do not claim that they ever read or relied on the contents of the Manual.  Whether the marginal relevancy of the Manual on this credibility issue is outweighed by other considerations under Rule 403 is a matter that must be decided at trial.  Plaintiffs should not make these arguments without first raising the issue with the Court.

15.     The Court has considered DWMC's motion in limine no. 11.  Doc. 284. The motion seeks to preclude Plaintiffs' treating physicians from testifying at trial, arguing that they have not been designated as experts under Rule 26.  Plaintiffs respond by citing what they consider to be the majority rule among federal courts in the United States.  Neither side has cited the two most relevant authorities in this case.

First, the Court's Case Management Order includes the following requirement: "Disclosures under Rule 26(a)(2)(A) must include the identities of treating physicians and other witnesses who have not been specially employed to provide expert testimony in this case, but who will provide testimony under Federal Rules of Evidence 702, 703, or 705.  A Rule 26(a)(2)(B) report is required for any opinion of such witnesses that was not developed in the course of their treatment or other factual involvement in the case."  Doc. 24 at 3.    Thus, Plaintiffs may not call any treating physician to give expert testimony that was not contained in their Rule 26(a)(2)(A) disclosure.  Nor may Plaintiffs call any treating physician to render an expert opinion that was not developed in the course of treatment unless that opinion was set forth in a Rule 26(a)(2)(B) report.

Second, in *Goodman v. Staples the Office Super Store*, *LLC*, 644 F.3d 817 (9th Cir. 2011), the Ninth Circuit held that a treating physician is only exempt from Rule 26(a)(2)(B)'s written report requirement to the extent that his opinions were formed during the course of treatment.  For opinions formed outside the course of treatment, a written report is required.   This case confirms the approach taken in the Case Management Order.

The Court cannot determine from the parties' memoranda which treating physician opinions may fall within this ruling.  As a result, the motion in limine will be **granted** to this extent: treating physicians may not provide expert opinions unless they were included in Plaintiffs' disclosures under Rule 26(a)(2)(B), nor may they provide an expert opinion that was developed outside the course of treatment unless they produced an expert report that stated the opinion.

16. The Court has considered DWMC's motion in limine no. 12. Doc. 285. DWMC argues that Plaintiff should be precluded from offering any evidence related to other accidents or alleged similar incidents. DWMC's motion fails to identify any specific evidence. Plaintiffs' response appears to agree, and argues that a test performed by one of Defendants' experts should be excluded. Plaintiffs also argue that they should not be precluded from offering evidence to show the feasibility of a safer alternative design. The parties appear to be talking past each other. The briefs do not address the same evidence, and therefore do not discuss the evidence with any level of specificity that would allow the Court to rule. DWMC's motion will be **denied** and the Court will not enter any order based on Plaintiffs' response that is not itself a motion.

17. The Court has considered DWMC's motion in limine no. 13. Doc. 286. DWMC argues that Plaintiffs should be precluded from presenting the testimony of their life care expert, Dr. Paul Deutsch. Plaintiffs argue that Dr. Deutsch is not a physician, did not consult with Plaintiff Manuel Bernal's treating physicians, and in other respects failed to do the work necessary to create a reasonable life care plan. The motion will be **denied**. DWMC's arguments go to the weight, not the admissibility, of Dr. Deutsch's testimony. Plaintiffs assert that Dr. Deutsch is a board certified life care planner, a board certified rehabilitation counselor, and a board certified case manager with a master's degree in rehabilitation counseling and a doctorate in counseling psychology with an emphasis in rehabilitation psychology. They assert he has spent 40 years practicing in this field, has authored 12 textbooks, and has authored 85 peer-reviewed journal articles and chapters relating to life care planning, rehabilitation planning, case management, and similar subjects. Doc. 314. The weight to be accorded Dr. Deutsch's opinions is for the jury to decide.

18. The Court has considered DWMC's motion in limine no. 14. Doc. 287. The motion argues that the Court should preclude Plaintiffs' expert economist from using a net negative discount rate with respect to his lost earnings calculation and his cost of

future care calculation.  The only case cited by DWMC, *Hardenbrook v. UPS*, 210 WL 3613818 (D. Idaho Sep. 3, 2010), did not address a motion in limine or any other request to exclude evidence.  Rather, the Court addressed a motion to reduce the jury verdict.  Although the Court was troubled by the zero percent net discount rate used by the defense expert, the Court ultimately adopted that rate.  DWMC has provided no authority upon which the Court can conclude that the calculations of Plaintiffs' expert economist should be excluded.  DWMC does not argue that the expert economist is unqualified.  The motion will be **denied**.

19.    The Court has considered DWMC's motion in limine no. 15.  Doc. 288.  The motion seeks to exclude the lost earnings opinion of Plaintiffs' expert economist because it suffers from several defects:  an inaccurate annual income assumption, failure to consider the Arizona marketplace, failure to utilize a work life table, an assumption that Mr. Bernal would earn the same amount every year until retirement at age 66, and an unreliable earnings growth rate.  Plaintiffs respond to each of these arguments, asserting that their expert's opinions are reasonable.  Plaintiffs note that their expert relied on Mr. Bernal's W-2 forms and considered the Phoenix marketplace.  They note that there is no standard work life table that economists rely on for Mr. Bernal's category of work, and that their expert did not assume an unreasonable growth rate, assuming instead that Mr. Bernal's income would remain constant over time.  They also note that the expert relied on published data from the U.S. Department of Labor for calculating an earnings growth rate of 3.37 percent, and assumed a retirement age based on data from the U.S. Social Security Administration.  The Court concludes that DWMC's arguments go to the weight, not the admissibility, of Plaintiffs' expert economist's opinions.  The motion will be **denied**.

20.    The Court has considered DWMC's motion in limine no. 16.  Doc. 289.  The motion seeks to preclude Plaintiffs from suggesting to the jury that DWMC failed to produce any evidence or committed any type of spoliation in this case.  Plaintiffs respond

that they do not intend to present such evidence unless Defendants open the door by making claims about the amount of evidence produced. Doc. 317. The motion will be **granted**. If Plaintiffs conclude during the course of trial that DWMC has opened the door to the presentation of such evidence, Plaintiffs should raise the issue with the Court outside the hearing of the jury.

21. The Court has considered DWMC's motion in limine no. 17. Doc. 290. The motion argues that if the Court does not preclude Plaintiffs' seatbelt claim in response to DWMC's motion in limine no. 4, the Court should preclude seatbelt evidence because Plaintiffs failed to preserve the vehicle in this case. The Court does not agree. The Court cannot conclude that Plaintiffs were culpable in failing to preserve the vehicle. The vehicle was damaged while in the possession of Mexican police. The motion will be **denied**.

22. The Court has considered DWMC's motion in limine no. 18. Doc. 291. It argues that DWMC should be permitted to present evidence concerning the circumstances under which the vehicle at issue in this case was burned in a fire if the Court permits Plaintiffs to present a seatbelt claim.

Plaintiffs' position on the seatbelt issue is not clear. In response to this motion, Plaintiffs state: "Defendants' motion should be denied because the characteristics and performance of the seatbelts in the specific vehicle at issue are irrelevant to Plaintiffs' design defect claims, as no party is arguing that the seatbelts did not operate as designed." Doc. 319 at 1. In their supplemental filing following the final pretrial conference, however, Plaintiffs assert that "[t]he defective nature of the survival space, *which includes the performance of the restraint system* has been disclosed[.]" Doc. 345 at 1 (emphasis added).

Although Plaintiffs' position is not clear, to the extent they contend that the seatbelt system was designed defectively or performed improperly, DWMC will be permitted to present evidence that it was unable to examine or test the system because the

vehicle was destroyed by fire before Defendants were aware of the lawsuit. To this extent, the motion will be **granted**.

23. The Court has considered DWMC's motion in limine no. 19. Doc. 292. The motion asks the Court to exclude evidence of the 2001 recall under which Defendants added padding to the passenger's side A-pillar and, voluntarily, to the driver's side A-pillar. Plaintiffs argue in response that their theory in the case concerns defects in the vehicle's roof structure, but they do not suggest that the recall concerned the roof structure. They argue that they had identified the A-pillars as key elements of the roof structure, but again, they do not argue that the recall concerned the structural integrity of the A-pillars. They argue that testing of the pillars was important, but they do not suggest that the recall concerned testing of the pillars. They also argue that the padding strengthened the pillars. The Court fails to see how this argument supports their structural defect theory. In short, although Plaintiffs throw out a number of off-target arguments, they do not identify any direct relevance of the recall to their crashworthiness theories in this case. The Court concludes that the marginal relevancy of the recall (to add padding to the pillars) is substantially outweighed by the risk of juror confusion and undue delay in the resolution of this trial. As a result, DWMC's motion will be **granted** and the evidence will be precluded under Rule 403.

24. The Court has considered DWMC's motion in limine no. 20. Doc. 293. The motion argues that the Court should instruct the jury on the risk-benefit analysis approach to determining a defective product, rather than the consumer expectation test. DWMC argues that the average consumer has no reasonable expectation as to how a roof structure and windows should perform during a rollover accident, and that the consumer expectation test therefore should not be used. DWMC does not argue that the risk-benefit test is a better fit for the inquiry as to whether the vehicle design here was unreasonably dangerous, only that the consumer expectations test does not fit at all. Plaintiffs urge that the consumer expectation test is appropriate in this case, and that in close cases it should

not be excluded.  Doc. 321.

DWMC cites several cases, but none serves as a basis for excluding evidence here. *Czarnecki v. Volkswagen of America* held that a consumer expectation instruction should be given "only as supported by the evidence."  837 P.2d 1143, 1152 (Ariz. Ct. App. 1991) (internal quotation marks omitted).  *Golonka v. General Motors Corp.* noted the following:

> The consumer expectation test works well in manufacturing defect cases because consumers have developed safety expectations from using properly manufactured products of the same general design. . . . In design defect cases, however, the consumer expectation test has limited utility as "the consumer would not know what to expect, because he would have no idea how safe the product could be made." . . . Consequently, when application of the consumer expectation test is *unfeasible or uncertain* in design defect cases, courts *additionally or alternatively* employ the risk/benefit analysis to determine whether a design is defective and unreasonably dangerous.

65 P.3d 956, 962 (Ariz. Ct. App. 2003) (emphasis added; citations omitted).  *Golonka* does not entirely rule out the possibility that the consumer expectation test may apply in design defect cases, nor does it suggest that a court must always exclude the test even when application of the test is unfeasible or uncertain.  In sum, these two cases suggest that courts should make jury instruction determinations after the evidence has been presented and that instructions not supported by the evidence should be excluded.

DWMC also cites to *Brethauer v. General Motors Corp.*, which analyzed the Arizona Supreme Court's treatment of the consumer expectation test in *Dart v. Wiebe Manufacturing, Inc.*, 709 P.2d 876 (Ariz. 1985).  *Brethauer*, 211 P.3d 1176, 1183 (Ariz. Ct. App. 2009).  *Brethauer* recognized that "*Dart* tells us the consumer expectation test is inapplicable in situations when a consumer cannot form an expectation as to how safely the product could be made."  *Id.*  *Brethauer* went on to state, however, that *Dart* does not mean "an ordinary consumer must have an expectation about the specifics of design before the consumer expectation test can be employed."  *Id.*  Instead, *Brethauer*

observed, "the consumer's expectation referred to in *Dart* necessarily is an expectation of how safely the product could be made to perform." *Id.* *Brethauer* went on to conclude that "an instruction on the consumer expectation test is warranted in cases when the ordinary consumer, through use of a product, has developed an expectation regarding the performance safety of the product." *Id.* The court proceeded to find that a consumer-expectation instruction on design of safety seatbelts to be warranted, and that failure to give the jury instruction was error, *id.* at 1184, albeit not reversible error, *id.* at 1185.

DWMC argues that *Brethauer* can be distinguished because the product in that case – the seatbelt – is used by consumers every day and therefore the average consumer can develop an informed performance expectation. Doc. 293 at 2. In contrast, expectations regarding the performance of roofs and window glass during a crash cannot be formed because crashes are so infrequent. *Id.* at 2-3. The argument is flawed, however, because *Brethauer* involved performance of a seatbelt during a crash. 211 P.3d at 1177. Therefore, the infrequency of crashes does not appear to be a dispositive factor under *Brethauer*. The notion that the proper performance of a seatbelt during a crash may perhaps be more intuitive than the proper performance of a roof or window glass during a crash has some persuasive merit, but the mere fact that the latter performance may be less intuitive is insufficient under the cited case law to preclude the consumer expectation test at this point in the case. The Court must decide this issue after the evidence has been presented. The motion will be **denied**.

25. The Court has considered Plaintiffs' motion in limine no. 1. Doc. 250. Plaintiffs ask the Court to preclude Defendants from asserting the "diving/torso-augmentation theory" because Defendants did not affirmatively plead this defense in their answers. The Court does not agree, however, that the theory constitutes an affirmative defense. Plaintiffs argue that Manuel Bernal suffered traumatic neck injuries when the roof of the vehicle collapsed during the rollover. In response, Defendants assert that the neck injuries occurred when Mr. Bernal's head came into contact with the intact roof of

the vehicle and his body weight caused compression in the neck and the resulting spinal injuries. Defendants' theory is therefore a direct response to Plaintiffs' alleged method of injury. Although Defendants will have the burden of proof on this issue to the extent they wish the jury to find their version of the events true by a preponderance of the evidence, the Court does not view this counter-argument as an affirmative defense in the traditional sense.

Moreover, even if Defendants' theory could be viewed as an affirmative defense, the Ninth Circuit has held that defendants may raise affirmative defenses late in the litigation, including at the summary judgment stage, provided the delay does not prejudice the plaintiff. *See Panaro v. City of N. Las Vegas,* 432 F.3d 949, 952 (9th Cir. 2005) ("A defendant may raise an affirmative defense at the summary judgment stage as long as the plaintiff does not suffer prejudice."); *Paine v. City of Lompoc*, 265 F.3d 975, 981 n.1 (9th Cir. 2001) ("[B]ecause [plaintiff] has not argued that he suffered prejudice due to the defendants' tardy assertion of this defense, the defense is not waived."). As the Court previously found, Plaintiffs have been well aware of Defendants' theory throughout this case. Doc. 244 at 2. Indeed, it was first mentioned in the litigation by Plaintiffs' expert. *Id.* As a result, Plaintiffs are not prejudiced by Defendants' assertion of the theory and the motion in limine will be **denied**.

26. The Court has considered Plaintiffs' motion in limine no. 2. Doc. 251. The motion asks the Court to preclude Defendants from offering any evidence or argument apportioning damages between the alleged design defect and other causes. Plaintiffs argue that such a ruling is warranted because Defendants have not disclosed any evidence that would support an argument that Plaintiffs' damages could be apportioned. This is, in effect, a motion for summary judgment. In a *Celotex*-type argument, Plaintiffs ask the Court to rule in their favor on the apportionment issue because Defendants have no evidence to support their side of such an argument. But Defendants are not obligated to produce such evidence to Plaintiffs unless it has been requested in discovery, and

Plaintiffs make no argument that Defendants have failed to produce such evidence in response to a discovery request. As a result, the Court is not able to preclude Defendants from making apportionment arguments on the basis of their failure to produce evidence supporting apportionment. Whether Defendants can present evidence on any particular aspect of the apportionment argument, and what jury instructions might be appropriate in light of such evidence, must be determined at trial. The motion is **denied**.

27. The Court has considered Plaintiffs' motion in limine no 3. Doc. 252. The motion asks the Court to preclude Defendants from asserting comparative fault in this crashworthiness case and from otherwise offering evidence of Mr. Bernal's alleged speeding, failure to control the vehicle, inattention, or lack of sleep. The Court has also considered Plaintiffs' motion in limine no. 4. Doc. 253. That motion asks the Court to preclude the same evidence under a defense of contributory negligence.

These motions raise difficult issues about the applicability of fault-comparison defenses in light of the Arizona common law rule that contributory negligence is not a defense in a product defect case and the Arizona statutory comparative fault law found in A.R.S. § 12-2506. These motions are also related to the apportionment issue raised in Plaintiffs' motion in limine no. 2, which concerns apportionment between harms caused by product defect and those caused by other factors. Together, these motions raise the question of whether the jury will be asked to apportion, on any basis, the losses incurred in this case, or whether it will be asked to make an all-or-nothing decision in favor of either Plaintiffs or Defendants.

As a general matter, Arizona moved away from the all-or-nothing approach to tort trials when it adopted a scheme of comparative fault in A.R.S. § 12-2506. The statute generally requires the jury to apportion fault among all persons who contributed to the loss, whether parties or not. Such an approach in this case would allow the jury to apportion fault between Defendants, if they found product defect, and Plaintiff Bernal, if they found that speeding or inattention contributed to the accident.

As Plaintiffs note, however, the Arizona Supreme Court, after the passage of A.R.S. § 12-2506, confirmed the common law rule that contributory negligence is not a defense in a product defect case. In *Jimenez v. Sears, Roebuck and Co.*, 904 P.2d 861 (Ariz. 1995), the court confirmed that contributory negligence is not a defense in a product liability case, explaining that the doctrine of strict product liability "allocat[es] the risk of loss to the manufacturers and sellers of [unreasonably dangerous] products." *Id.* at 864. The court recognized that assumption of risk and product misuse are affirmative defenses in such actions, but made clear that neither defense can be construed as permitting contributory negligence. The court stated that "[c]ontributory negligence is not applicable to strict liability because, under the doctrine of strict liability, 'no duty rests upon the ultimate consumer or user to search for or guard against the possibility of product defects.'" *Id.* at 865 (citation omitted). The court did apply Arizona's comparative fault scheme to the misuse alleged in the case rather than treating misuse as a complete defense. *Id.* at 866.

DWMC focuses its attention on *Zuern v. Ford Motor Co.*, 937 P.2d 676 (Ariz. Ct. App. 1997), an Arizona Court of Appeals case decided after *Jimenez* that applied Arizona's comparative fault scheme to an automobile product liability case. *Zuern* held that the jury could apportion fault between the manufacturer of the automobile and the driver who ran into the back of the plaintiffs' vehicle. *Id.* at 682. *Zuern* acknowledged *Jimenez,* but *Jimenez* was not controlling because it concerned the contributory negligence of the plaintiff while *Zuern* concerned the comparative fault of a third party. *Zuern* applied A.R.S. § 12-2506 as written, noting that fault in the comparative fault statute includes negligence, strict liability, product liability, and virtually every other kind of fault.

The Court has had some difficulty in determining how to apply *Jimenez* and *Zuern* in this case. The Court discussed this issue at some length with the parties during the final pretrial conference. *Jimenez* would appear to hold that the alleged fault of Mr.

Bernal cannot be considered by the jury in determining Mr. Bernal's recovery from Defendants. Even if the jury were to find that he was speeding and inattentive, and that this contributed to his injuries, the jury must hold Defendants completely responsible for his injuries if a defect in the vehicle was a proximate cause of those injuries. By contrast, *Zuern* holds that the same rule does not apply to Mrs. Pacheco's statutory beneficiaries. Mrs. Pacheco is not alleged to be at fault, so no issue of contributory negligence arises.[1] But Mr. Bernal, like the driver who rear-ended the plaintiffs in *Zuern*, is alleged to be at fault. Under *Zuern*, therefore, the jury could reduce Mrs. Pacheco's recovery from Defendants to the extent they find that her death was caused by Mr. Bernal's alleged speeding or inattention. *Jimenez* and *Zuern* would thus lead to the anomalous result that Mrs. Pacheco's losses can be reduced by Mr. Bernal's fault, but Mr. Bernal's losses cannot. The more culpable plaintiff recovers 100% of his losses and the non-culpable plaintiff has her losses reduced by comparative fault.

On closer reading, the Court concludes that *Jimenez* does not require this result. *Jimenez* relied on and cited to *O.S. Stapley Co. v. Miller*, 447 P.2d 248, 251-52 (Ariz. 1968), when noting that Arizona rejected contributory negligence as a defense to product liability. *Jimenez*, 904 P.2d at 864. *Miller* states the following: "We hold that contributory negligence, *as defined above*, is not a defense under the products liability doctrine and we emphasize that no duty rests upon the ultimate consumer or user to search for or guard against the possibility of product defects." 447 P.2d at 253 (emphasis added). The contributory negligence "defined" in *Miller* was limited to that described by comment n of § 402A of the Restatement (Second) of Torts ("Restatement"), namely: "negligence [that] consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence." *Miller*, 447 P.2d at 253 (citing Restatement). The full Restatement comment reads as follows:

---

[1] For purposes of this analysis, the Court focuses on the alleged fault of Mr. Bernal, not the alleged fault of Mrs. Pacheco in allegedly wearing her seatbelt improperly.

> Contributory negligence. Since the liability with which this Section deals is not based upon negligence of the seller, but is strict liability, the rule applied to strict liability cases (see § 524) applies. *Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence.* On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.

*Miller*, 447 P.2d at 253 (emphasis added) (citing Restatement). In relying on *Miller* in a case involving facts not distinguishable from *Miller*, *Jimenez* necessarily limited the type of contributory negligence at issue in its holding to that of *Miller*. Indeed, *Jimenez* used the same definition of contributory negligence as *Miller* and the Restatement. *Jimenez*, 904 P.2d at 864 ("In [*Miller*] we explained the differences between contributory negligence, assumption of risk, and misuse: . . . '[F]ailure to discover a defect in the product which the plaintiff should, if he was reasonably diligent, have discovered' is contributory negligence[.]"); *id.* at 865 ("These concepts distinguish misuse from contributory negligence, which involves careless use for a proper purpose." (citing Restatement § 402A cmt. n)).

In this case, Defendants do not contend that Mr. Bernal was negligent in failing to discover and protect against a defect in their product. Rather, they claim that Mr. Bernal was negligent in operating the vehicle, leading to the accident that caused his and Kevin's injuries and Mrs. Pacheco's death. This negligence cannot be characterized as merely a "failure to discover the defect in the product" or "guard against the possibility" of its existence. *Jimenez*, 904 P.2d at 864; *Miller*, 447 P.2d at 253. As a result, in an effort to harmonize *Jimenez* and *Zuern*, and to avoid the anomalous result they would produce in this case, the Court concludes that the kind of fault asserted by Defendants against Mr.

Bernal is not the narrowly defined contributory negligence addressed in *Jimenez*. Rather, it is more akin to the kind of such fault apportioned under Arizona law in *Zuern*. The Court also concludes apportionment of fault appears to be consistent with the intent of A.R.S. § 12-2506 as written, including its definition of fault to include negligence, strict liability, and product liability. A.R.S. § 12-2506(F)(2).

The Court recognizes that this holding can be viewed as inconsistent with the contributory negligence doctrine as defined in Arizona cases before *Jimenez*. In *Cota v. Harley Davidson*, 684 P.2d 888 (Ariz. Ct. App. 1984), for example, the Arizona Court of Appeals held that where the cause of action is product liability in a crashworthiness case, evidence that the plaintiff "had been drinking prior to the accident and that his motorcycle was in the wrong lane of traffic at the time of the collision" was properly excluded as irrelevant to either liability or damages. *Id.* at 895-96. But after *Cota*, Arizona adopted a comparative fault scheme in A.R.S. § 12-2506. *Zuern* applied that scheme to a product liability crashworthiness case.

The Court also recognizes that *Jimenez* was decided by the Arizona Supreme Court and *Zuern* by the Arizona Court of Appeals, and that this Court is bound to follow decisions of the Arizona Supreme Court. But as explained above, following both cases could produce clearly anomalous and inequitable results in this case, and *Zuern* was decided after *Jimenez* and applied a clear Arizona statute. Moreover, none of the justices who decided *Jimenez* remain on the Arizona Supreme Court today, and the author of *Zuern* has been elevated to the Supreme Court. Where Arizona law is unclear, this Court's task is to predict what the Arizona Supreme Court would say on the issue today. *Takahashi v. Loomis Armored Car Serv.*, 625 F.2d 314, 316 (9th Cir. 1980) ("In the absence of controlling forum state law, a federal court sitting in diversity must use its own best judgment in predicting how the state's highest court would decide the case."). The Court concludes that *Jimenez* would likely be limited to the narrow definition of contributory negligence it adopted, and that the Supreme Court would apply the

comparative fault scheme of A.R.S. § 12-2506 in a case such as this. The Court finds it less likely that the Supreme Court would overrule *Zuern* given the clear direction of A.R.S. § 12-2506, and the Court does not believe the Supreme Court would endorse a scheme under which Mrs. Pacheco's losses can be reduced by Mr. Bernal's fault and Mr. Bernal's cannot.

As a result, the Court holds that principles of comparative fault apply in this case to the claims of all plaintiffs. Given this holding, it will not be necessary to discuss or apply common law principles of contributory negligence at trial. This case will proceed under the scheme adopted by the Arizona legislature in A.R.S. § 12-2506. Plaintiffs' motion in limine no. 3 is therefore **denied** and motion in limine no. 4 is **granted**.

28. The Court has considered Plaintiffs' motion in limine no. 5. Doc. 254. Plaintiffs ask the Court to preclude Defendants from offering any evidence or argument regarding alleged speeding by Plaintiff Bernal. This motion is based largely on the arguments rejected with respect to Plaintiffs' motion in limine no. 3. As explained above, comparative fault principles will apply in this case. Plaintiffs also suggest, but do not argue vigorously, that Defendants' evidence of speeding is unreliable and would be unduly prejudicial under Rule 403. The Court does not agree. Plaintiffs have not presented any persuasive argument that Defendants' accident reconstruction expert is incapable of estimating the speed of the vehicle at the time of the accident. Nor can the Court conclude that evidence of speeding would be unfairly prejudicial to Plaintiffs given the Arizona law requiring the jury to apportion fault among all parties that contributed to the injuries. The motion will be **denied**.

29. The Court has considered Plaintiffs' motion in limine no. 6. Doc. 255. The motion asks the Court to preclude Defendants from offering any allegations contained in the Accident Report and any other testimony that Plaintiff Bernal was speeding or otherwise inattentive. Plaintiffs' argument again relies on their assertion that comparative fault does not apply in this case, an assertion rejected above. Plaintiffs also

argue that the lay opinions of the Mexican highway patrol officers, as reflected in the Accident Report, are inadmissible under Rule 701. The Court agrees. Officer Hernandez testified that he received accident reconstruction training as part of his law enforcement duties. Doc. 255-2 at 20-21. He provided estimates of the vehicle's speed when it left the roadway, as well as an opinion that the driver was inattentive or possibly asleep. These opinions appear from the deposition to be based on Officer Hernandez's training. Because the opinions are based on "scientific, technical or other specialized knowledge within the scope of Rule 702," they cannot be admitted as lay witness opinions under Rule 701. *See* Fed. R. Evid. 701(c). Officer Hernandez did not see the accident, and thus did not base his opinions on common perceptions people have from observing the operation of automobiles. Rather, Officer Hernandez determined the speed and the attentiveness of the driver after the fact on the basis of physical evidence at the scene. Because his opinions were based on the specialized knowledge of accident reconstruction, they properly fall within the scope of Rule 702 and cannot be given as lay opinions under Rule 701. Officer Hernandez was never designated as an expert by Defendants under Rule 702.

The Court cannot reach the same conclusion, however, with respect to Defendants' accident reconstruction expert, Ronald L. Woolley. Dr. Woolley also opined about the speed of the vehicle on the basis of mathematical calculations as well as the attentiveness of the driver on the basis of physical evidence at the scene. Dr. Woolley was identified as an expert under Rule 702. Plaintiffs do not argue that he is unqualified to provide such opinions. The Court will **grant** Plaintiffs' motion with respect to the opinions of the Mexican highway patrol officers concerning the speed of the vehicle at the time of the accident and the attentiveness of the driver, whether those opinions are solicited during live testimony or are reflected in the Accident Report. The Court will **deny** the motion with respect to Dr. Woolley's opinions concerning the speed of the vehicle and the attentiveness of the driver.

30.     The Court has considered Plaintiffs' motion in limine no. 7.  Doc. 256.
Plaintiffs ask the Court to preclude Defendants from presenting evidence that Dolores
Pacheco was improperly wearing her seatbelt, or that she was improperly seated prior to
the accident.  Plaintiffs contend that opinions to this effect amount to nothing more than
unfounded speculation and should be excluded as unreliable under Rule 702.  The Court
does not agree.  Defense experts Michael Carhart and Thomas McNish both opined that
Mrs. Pacheco was improperly wearing her seatbelt at the time of the accident.  Dr.
McNish's conclusions are based on the forces generated during the vehicle's rollover, the
effect of such forces on a properly restrained person as opposed to an improperly
restrained person, and the final position of Mrs. Pacheco's body at the end of the rollover.
The Court cannot conclude that this opinion is based on insufficient facts or data or the
product of unreliable principles or methods, nor that Dr. McNish applied the principles or
methods unreliably.  Plaintiffs do not contest the qualifications of Dr. McNish to opine on
the subjects.   Dr. Carhart based his opinion on a review of available photographs,
deposition testimony, and interview statements.  He evaluated the forces and rotational
rates of the rollover, and opined that the final position of Mrs. Pacheco's body was not
consistent with proper seatbelt restraint.  Doc. 340-4 at 20, 32-33.  The Court cannot
conclude that his opinions are based on insufficient data or facts, unreliable principles or
methods, or the unreliable application of principles or methods.  As with Dr. McNish,
Plaintiffs do not dispute Dr. Carhart's qualifications to testify on this subject.

Plaintiffs note that Manuel and Kevin Bernal both testified that Mrs. Pacheco was
properly seated and belted at the time of the accident, but this testimony is not a basis for
excluding defense expert opinions.  The jury will be called upon to decide the credibility
of the witness testimony and opinions.

The Court concludes that Plaintiffs' arguments go to the weight, not the
admissibility of the evidence.  *See Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1188
(9th Cir. 2002).  ("In most cases, objections to the inadequacies of a study are more

appropriately considered an objection going to the weight of the evidence rather than its admissibility"). The motion will be **denied**.

31. The Court has considered Plaintiffs' motion in limine no. 8. Doc. 258. Plaintiffs ask the Court to preclude Defendants from offering any evidence regarding the alleged severity of this accident based on the number of rolls, specifically evidence that that rollover in this case was more severe than 99% of all rollover accidents.

Plaintiffs first argue that such evidence amounts to a product misuse defense, which has been dismissed in this case. The Court does not agree. The evidence is being admitted to rebut Plaintiffs' argument that this accident was of a reasonably foreseeable variety and Defendants should have designed a vehicle to withstand such an accident. Defendants will argue that this was an extreme accident and that the damage and injuries do not fall within the reasonably foreseeable events against which Defendants reasonably could have offered design protection. This is not a product misuse argument.

Second, Plaintiffs again argue that contributory negligence is not a defense and that the severity of the accident is therefore not admissible. As explained above, comparative fault principles will apply in this case. Moreover, the Court does not view the severity of the accident as primarily being addressed to Plaintiffs' comparative fault. Rather, it is addressed to the question of whether the vehicle in question should have been designed to withstand the forces generated in this accident.

Third, Plaintiffs argue that Defendants' 99% argument asks the jury to compare this accident to others, and that other-accident evidence is admissible only if the other accidents are substantially similar. The Court does not agree that this is other-accident evidence. Defendants are not presenting the evidence to show that this accident was similar to others, but that it was dissimilar – that the forces generated in this accident were unusually severe. Defendants rely on data from the National Highway Transportation Safety Administration ("NHTSA") based on the number of rolls in a rollover accident, data which suggests that this accident was more severe than 99% of

rollover accidents. Plaintiffs' expert disputes the NHTSA data and Defendants' argument that the accident was unusually severe, but this dispute of fact does not make Defendants' evidence inadmissible.

The Court concludes that a critical question in this case is whether the vehicle should have been designed to withstand the forces generated in this crash. The severity of the accident is clearly relevant. Plaintiffs do not challenge the qualifications of the expert who relies on the NHTSA data, nor do they challenge the existence of the NHTSA data. Plaintiffs do not contend that the NHTSA data is based on an incomplete or inaccurate sampling of rollover accidents. Plaintiffs' motion is **denied**.

32. The Court has considered Plaintiffs' motion in limine no. 9. Doc. 260. Plaintiffs ask the Court to preclude Defendants from offering any evidence that the subject vehicle met or exceeded federal motor vehicle safety standards and regulations. Specifically, Plaintiffs ask the Court to exclude evidence of the vehicle's compliance with FMVSS 216, which prescribes minimum roof strength. In support of their motion, Plaintiffs cite cases from states other than Arizona. The motion will be **denied**. Arizona cases hold that compliance with national standards "may be considered in determining whether a product is defective." *Hohlenkamp v. Rheem Mfg. Co.,* 655 P.2d 32, 36 (Ariz. Ct. App. 1982). "Industry standards have also been found to be admissible in strict liability on the ground that these standards often constitute substantive evidence on the strict liability issue of whether a product is in a defective condition, unreasonably dangerous to the user." *Id.* Plaintiffs may seek a limiting instruction concerning compliance with the federal standards – that such compliance is not an absolute defense to Plaintiffs' claim, but only a factor the jury should consider in deciding whether the vehicle in this case was defective and unreasonably dangerous.

33. The Court has considered Plaintiffs' motion in limine no. 10. Doc. 262. Plaintiffs ask the Court to preclude Defendants from offering any evidence of simulated rollover testing, arguing that the testing was performed on vastly different vehicles under

different speeds, angles, and conditions than occurred in this case. DWMC's response makes clear that Defendants do not intend to present rollover evidence as a simulation of the accident that occurred in this case. Rather, Defendants intend to use data generated from rollover accidents in support of expert opinions concerning Plaintiffs' allegation that the vehicle in this case was defectively designed and that Plaintiffs' injuries were caused by the defective design. The Ninth Circuit has recognized that "[a] showing of substantial similarity is required when a plaintiff attempts to introduce evidence of other accidents as *direct proof* of negligence, a design defect, or notice of the defect." *Cooper v. Firestone Tire & Rubber Co.,* 945 F.2d 1103, 1105 (9th Cir. 1991) (emphasis added). But when evidence of data generated in rollover tests is not presented as direct evidence of lack of a defect, rules may be relaxed.

The Court cannot conclude at this stage that Defendants' rollover testing evidence should be excluded. That determination will depend upon the extent to which the evidence is used to suggest that the rollover tests replicate the accidents at issue in this case. If such a suggestion is made, the evidence likely will be excluded. If, however, the rollover testing is simply used to provide data relied on by defense experts in forming opinions applicable to this case, and the suggestion is not made to the jury that the rollover tests replicate what occurred in this case, the evidence likely will be admissible. The Court's decision on this issue must be made in the context of trial, particularly in light of evidence produced by Plaintiffs' expert and the manner in which the rollover testing data is intended to be used by defense experts. Plaintiffs' motion will be **denied**.

34. The Court has considered Plaintiffs' motion in limine no. 11. Doc. 263. Plaintiffs ask the Court to preclude Defendants from offering any evidence or argument that the design of the windshield header supporting the roof of the vehicle is state of the art. Plaintiffs cite evidence from their experts and defense experts suggesting that alternative designs were available, and argue that Defendants have failed to present evidence that the safer design proposed by Plaintiffs was not in existence or reasonably

feasible at the time of manufacture. The Court previously denied Plaintiffs' motion for summary judgment on the state of the art defense. Doc. 244 at 6-8.

The parties have presented a sharp factual dispute regarding the design of the vehicle's roof and its performance during the accident at issue in this case. Whether the evidence presented during trial will support a state of the art jury instruction cannot be determined at this time. Plaintiffs essentially ask the Court to pre-judge the evidence without having heard the testimony of the various experts. The Court will decide at the close of the evidence whether a state of the art jury instruction is warranted. Plaintiffs' motion is **denied**.

35. The Court has considered Plaintiffs' motion in limine no. 12. Doc. 264. Plaintiffs ask the Court to preclude Defendants from offering any evidence or argument that the warnings associated with the vehicle in this case were state of the art. Plaintiffs base their argument on the fact that Defendants have never produced evidence to support such a state of the art defense. DWMC argues in response that Plaintiffs have never asserted a failure-to-warn claim in this case. As a result, any state of the art defense to such a claim has not been the subject of discovery.

The parties' proposed final pretrial order does not assert a failure-to-warn claim. As a result, it appears that the warnings associated with the vehicle in this case will be irrelevant for all parties. Plaintiffs' motion is therefore **granted**.

36. The Court has considered Plaintiffs' motion in limine no. 13. Doc. 265. Plaintiffs ask the Court to preclude Defendants from introducing evidence that some or all of Plaintiffs' medical expenses were paid by a third party – the collateral source rule. DWMC does not oppose the motion. Doc. 335. As a result, the motion is **granted**. No party shall introduce evidence or arguments concerning the payment of Plaintiffs' medical expenses by a third party, including Medicare, Medicaid, and other government programs.

37. The Court has considered Plaintiffs' motion in limine no. 14. Doc. 267.

Plaintiffs ask the Court to preclude Defendants from offering any evidence or argument pertaining to testing or statistics from simulations using unbelted crash dummies. Plaintiffs argue that such crash simulations are not sufficiently similar to this accident to be admissible. DWMC responds by stating "that evidence of testing on unbelted crash dummies in this particular case is <u>not</u> intended to somehow replicate the results of this particular rollover accident[.]" Doc. 336 (emphasis in original). Rather, defense experts will rely on such testing to rebut the assertion of Plaintiffs' experts that laminated glass would have kept the occupants within the vehicle. Defense experts will assert that testing on unbelted dummies have demonstrated that laminated glass does not provide the "life net" that Plaintiffs' expert asserts.

The Court cannot conclude that testing on unbelted dummies will be presented by Defendants as a purported simulation of the accident in this case. As a result, it appears that the substantial similarity test does not apply. Moreover, Plaintiffs rely heavily on their expert's assertion that laminated window glass would have prevented the complete ejection of Kevin Bernal and the partial ejection of Mrs. Pacheco during the accident. Testing which appears to refute the ability of laminated glass to provide such protection is clearly relevant for the jury's consideration. Plaintiffs' motion is **denied**. As with the rollover testing discussed above, however, this ruling does not prevent Plaintiffs from objecting during trial if Defendants attempt to use the unbelted dummy testing in a manner which suggests that the testing replicates the events that occurred in this case.

38. The Court has considered Plaintiffs' motion in limine no. 15. Doc. 270. Plaintiffs ask the Court to preclude Defendants from offering evidence or argument regarding industry custom, including roof design, windshield header design, and side glass designs of other vehicles. Plaintiffs argue that industry custom is not the same as state of the art, and cite a Washington case which precluded such evidence. DWMC notes that Arizona and other states have admitted industry custom as a relevant consideration in a product defect case on the question of state of the art. The primary

Arizona case cited by Plaintiffs, *Gosewisch v. American Honda Motor Co.*, 737 P.2d 365 (Ariz. Ct. App. 1985), *rev'd on other grounds*, 737 P.2d 376 (Ariz. 1987), itself acknowledges that "customs of an industry may be relevant" to a state of the art defense. The Court cannot conclude at this stage that the industry customs evidence to be presented by Defendants is irrelevant. Plaintiffs' motion is **denied**.

39. The Court has considered Plaintiffs' motion in limine no. 16. Doc. 271. Plaintiffs ask the Court to rule that the consumer expectation test and risk-benefit analysis are both applicable in this defective design case. The Court has already denied DWMC's motion seeking to exclude the consumer expectation test. As the Court's ruling on that issue made clear, the Court will rule on the appropriate jury instruction after hearing the evidence in this case. Plaintiffs' motion is **denied**.

40. The Court has considered Plaintiffs' motion in limine no. 17. Doc. 279. Plaintiffs move for an order that Arizona law applies to all claims and move to exclude evidence and testimony regarding "the nationality and immigration status of decedent Dolores Pacheco and the statutory beneficiaries." *Id.* The Court has already ruled that Arizona law applies. Doc. 30. DWMC argues that "information regarding the Mexican citizenship of Dolores Pacheco and Paula Bernal was not before the Court at that time." Doc. 339 at 3. The Court fails to see how Mrs. Pacheco's citizenship is relevant to the wrongful death and loss of consortium claims, because these are not Mrs. Pacheco's claims. *E.g.*, *Barragan v. Superior Court of Pima Cnty.*, 470 P.2d 722, 724 (Ariz. Ct. App. 1970) ("A wrongful death action is an original and distinct claim for damages sustained by the statutory beneficiaries and is not derivative of or a continuation of a claim existing in the decedent." (citation omitted)). And although DWMC asserts that "Paula Bernal also confirmed that at the time of the accident her immigration status in the United States was not legal" (Doc. 339 at 2), DWMC fails to explain how this is relevant to Paula Bernal's domicile. Domicile does not necessarily follow citizenship. *See Lake v. Bonham*, 716 P.2d 56, 58 (Ariz. Ct. App. 1986) ("In order to establish domicile in

Arizona a party must show '(1) physical presence and (2) an intent to abandon the former domicile and remain here for an indefinite period of time.'" (quoting *DeWitt v. McFarland*, 537 P.2d 20, 21 (Ariz. 1975)). Domicile is the weightiest factor when choosing the applicable law in personal injury cases, *Garcia v. Gen. Motors Corp.*, 990 P.2d 1069, 1076 (Ariz. Ct. App. 1999), and DWMC has not shown that Paula Bernal's domicile was anywhere other than Arizona. Accordingly, Plaintiffs' motion is **granted**.[2]

41. Attached to this order are the Court's proposed voir dire questions. These questions will be discussed during the conference to be held on **March 20, 2012**.

42. Attached to this order are the Court's proposed preliminary jury instructions to be given at the beginning of trial. These instructions will also be addressed at the **March 20, 2012** conference.

43. The parties have been ordered to appear at a settlement conference before a Ninth Circuit mediator. As the Court made clear at the final pretrial conference, Defendants must comply with the order of Judge Burns requiring that a representative of insurers, with full authority, be present at the mediation. The parties promptly shall notify the Court if a settlement is reached.

44. At the close of the final pretrial conference, counsel for Defendant Daewoo America sought permission to amend its answer and assert a crossclaim against DWMC in this case. Such a request clearly is untimely and is **denied**.

Dated this 31st day of August. 2011.

_David G. Campbell_

_____
David G. Campbell
United States District Judge

---

[2] DWMC does not address surviving claims for Mrs. Pacheco for medical, funeral, and burial expenses as well as costs incurred in pursuing the claims (Doc. 32 at 9:12-14), but the figures are likely not significant when compared to the wrongful death and loss of consortium claims.

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Manuel Bernal and Paula Bernal, husband and wife, individually and on behalf of Kevin Bernal, their minor son; Paula Bernal on behalf of her minor child Kenya Bernal; Paula Bernal, surviving daughter of decedent Dolores Pacheco and on behalf of the estate of Dolores Pacheco; Christoper Bernal, individually, | ) ) ) ) ) ) ) ) ) | No.  CV09-1520 PHX DGC |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Daewoo Motor America, Inc., a Delaware corporation, | ) ) ) | |
| Defendant | ) ) | |
| _____ | ) | |

## COURT'S PRELIMINARY JURY INSTRUCTIONS
## AND VOIR DIRE

DATED: August 31, 2011

_____
David G. Campbell
United States District Judge

## 1.1A  DUTY OF JURY (COURT READS AND PROVIDES WRITTEN INSTRUCTIONS)

Ladies and gentlemen: You are now the jury in this case. It is my duty to instruct you on the law.

These instructions are preliminary instructions to help you understand the principles that apply to civil trials and to help you understand the evidence as you listen to it.  At the end of the trial, I will give you a final set of instructions.  It is the final set of instructions which will govern your deliberations.

You must not infer from these instructions or from anything I may say or do as indicating that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case.  To those facts you will apply the law as I give it to you.  You must follow the law as I give it to you whether you agree with it or not.  And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.  That means that you must decide the case solely on the evidence before you.  You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

## 1.2  CLAIMS AND DEFENSES

To help you follow the evidence, I will give you a brief summary of the positions of the parties:

The plaintiff claims that their 2000 Daewoo Leganza was defectively designed such that it was unreasonably dangerous and caused the injuries to plaintiffs.  The plaintiffs have the burden of proving these claims.

Daewoo Korea and Daewoo America deny those claims and also contend that the injuries to plaintiffs were not caused by any design defect.  Daewoo Korea and Daewoo America have the burden of proving these claims.

Plaintiffs deny Daewoo Korea's and Daewoo America's claims.

### 1.3  BURDEN OF PROOF – PREPONDERANCE OF THE EVIDENCE

When a party has the burden of proof on any claim by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

## 1.4 BURDEN OF PROOF – CLEAR AND CONVINCING EVIDENCE

When a party has the burden of proving any claim or defense by clear and convincing evidence, it means you must be persuaded by the evidence that the claim or defense is highly probable. This is a higher standard of proof than proof by a preponderance of the evidence.

You should base your decision on all of the evidence, regardless of which party presented it.

## 1.5  TWO OR MORE PARTIES – DIFFERENT LEGAL RIGHTS

You should decide the case as to each party separately. Unless otherwise stated, the instructions apply to all parties.

**1.6  WHAT IS EVIDENCE**

The evidence you are to consider in deciding what the facts are consists of:

1.      the sworn testimony of any witness;

2.      the exhibits which are received into evidence; and

3.      any facts to which the lawyers have agreed.

# 1.7  WHAT IS NOT EVIDENCE

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1)    Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they will say in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2)    Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3)    Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.  In addition sometimes testimony and exhibits are received only for a limited purpose; when I have given a limiting instruction, you must follow it.

(4)    Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

## 1.8  EVIDENCE FOR LIMITED PURPOSE

Some evidence may be admitted for a limited purpose only.

When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

## 1.9  DIRECT AND CIRCUMSTANTIAL EVIDENCE

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

# 1.10  RULING ON OBJECTIONS

There are rules of evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.  If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered, and the exhibit cannot be received.  Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence.  That means that when you are deciding the case, you must not consider the evidence that I told you to disregard.

# 1.11  CREDIBILITY OF WITNESSES

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.  Proof of a fact does not necessarily depend on the number of witnesses who testify about it.

In considering the testimony of any witness, you may take into account:

(1)     the opportunity and ability of the witness to see or hear or know the things testified to;

(2)     the witness's memory;

(3)     the witness's manner while testifying;

(4)     the witness's interest in the outcome of the case and any bias or prejudice;

(5)     whether other evidence contradicted the witness's testimony;

(6)     the reasonableness of the witness's testimony in light of all the evidence; and

(7)     any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

# 1.12  CONDUCT OF THE JURY

I will now say a few words about your conduct as jurors.

First, keep an open mind throughout the trial, and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide this case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty. Thus, until the end of the case or unless I tell you otherwise:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via e-mail, text messaging, or any Internet chat room, blog, Web site or other feature. This applies to communicating with your fellow jurors until I give you the case for deliberation, and it applies to communicating with everyone else including your family members, your employer, and the people involved in the trial, although you may notify your family and your employer that you have been seated as a juror in the case. But, if you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

Because you will receive all the evidence and legal instruction you properly may consider to return a verdict: do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the court immediately.

## 1.13  NO TRANSCRIPT AVAILABLE TO JURY

During deliberations, you will have to make your decision based on what you recall of the evidence.  You will not have a transcript of the trial.  I urge you to pay close attention to the testimony as it is given.

If at any time you cannot hear or see the testimony, evidence, questions or arguments, let me know so that I can correct the problem.

## 1.14  TAKING NOTES

If you wish, you may take notes to help you remember the evidence. If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case. Do not let note-taking distract you. When you leave, your notes should be left in the courtroom.  No one will read your notes.  They will be destroyed at the conclusion of the case.

Whether or not you take notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

### 1.16  JURY TO BE GUIDED BY OFFICIAL ENGLISH TRANSLATION/INTERPRETATION

Languages other than English may be used during this trial.

The evidence to be considered by you is only that provided through the official court interpreters. Although some of you may know [*language to be used*], it is important that all jurors consider the same evidence. Therefore, you must accept the English interpretation. You must disregard any different meaning.

## 1.17  USE OF INTERPRETERS IN COURT

You must not make any assumptions about a witness or a party based solely upon the use of an interpreter to assist that witness or party.

## 1.18  BENCH CONFERENCES AND RECESSES

From time to time during the trial, it may become necessary for me to talk with the attorneys out of the hearing of the jury, either by having a conference at the bench when the jury is present in the courtroom, or by calling a recess.  Please understand that while you are waiting, we are working.  The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

Of course, we will do what we can to keep the number and length of these conferences to a minimum.  I may not always grant an attorney's request for a conference.  Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or of what your verdict should be.

## 1.19  OUTLINE OF TRIAL

Trials proceed in the following way:  First, each side may make an opening statement. An opening statement is not evidence.  It is simply an outline to help you understand what that party expects the evidence will show.  A party is not required to make an opening statement.

The plaintiff will then present evidence, and counsel for the defendant may cross-examine.  Then the defendant may present evidence, and counsel for the plaintiff may cross-examine.

After the evidence has been presented, the attorneys will make closing arguments, and I will instruct you on the law that applies to the case.

After that, you will go to the jury room to deliberate on your verdict.

## 2.2  STIPULATIONS OF FACT

The parties have agreed to certain facts [to be placed in evidence as Exhibit __] [that will be read to you]. You should therefore treat these facts as having been proved.

## 2.4  DEPOSITION IN LIEU OF LIVE TESTIMONY

A deposition is the sworn testimony of a witness taken before trial.  The witness is placed under oath to tell the truth and lawyers for each party may ask questions.  The questions and answers are recorded.  When a person is unavailable to testify at trial, the deposition of that person may be used at the trial.

The deposition of [*witness*] was taken on [*date*].  You should consider deposition testimony, presented to you in court in lieu of live testimony, insofar as possible, in the same way as if the witness had been present to testify.

Do not place any significance on the behavior or tone of voice of any person reading the questions or answers.

## 2.7  FOREIGN LANGUAGE TESTIMONY

Witnesses who do not speak English or are more proficient in another language testify through an official court interpreter.  Although some of you may know [*language used*], it is important that all jurors consider the same evidence. Therefore, you must accept the interpreter's translation of the witness's testimony. You must disregard any different meaning.

## 2.11  EXPERT OPINION

Some witnesses, because of education or experience, are permitted to state opinions and the reasons for those opinions.

Opinion testimony should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

## 2.12  CHARTS AND SUMMARIES NOT RECEIVED IN EVIDENCE

Certain charts and summaries not received in evidence have been shown to you in order to help explain the contents of books, records, documents, or other evidence in the case. They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

## 2.13  CHARTS AND SUMMARIES IN EVIDENCE

Certain charts and summaries have been received into evidence to illustrate information brought out in the trial.  Charts and summaries are only as good as the underlying evidence that supports them.  You should, therefore, give them only such weight as you think the underlying evidence deserves.

## 4.1  CORPORATIONS AND PARTNERSHIPS – FAIR TREATMENT

All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration by you as any party.

# CIVIL VOIR DIRE QUESTIONS

1.    Read statement of the case.

    •    Have any of you read or heard anything about this case from any source whatsoever?

    •    Given this brief description of the facts, is there anything about this case that would cause you to believe that you could not consider the evidence fairly and impartially according to the law?

2.    Introduce self and staff: Lisa Richter, Tricia Lyons, Sara Cummings, Melissa Lou, and Nancy Johnson Outley.  Do any of you know me or any member of my staff on any basis, social, professional or otherwise?

3.    The Plaintiffs are represented by Julio M. Zapata, John Everroad and Scott Day Freeman of the law firm of Fennemore Craig.  Counsel please stand.

    •    Do any of you know Plaintiffs' counsel, or any of the employees in their office on any basis, social, professional or otherwise?

    •    Counsel, please introduce your clients and those present at the counsel table. Do any of you know these individuals on any basis, social, professional or otherwise?

4.    The defendant is represented by Larry Schmadeka and Scott Monson of the law firm of Lee, Hong, Degerman, Kang & Waimey and Michael O'Connor and Jonathan Weisbard of the law firm of Jennings, Strouss & Salmon.  Counsel please stand.

    •    Do any of you know the Defendant's counsel or any employees of their offices

on any basis, social, professional or otherwise?

- Counsel, please introduce your client and those present at the counsel table. Do any of you know these individuals on any basis, social, professional, or otherwise?

- If a company or corporation: Have any of you ever had a business or employment relationship of any kind with the defendant?

5.   The witnesses who may be called during this trial are: (<u>See Witness Tab</u>):

- Do any of you know or think you might know any of these witnesses?

6.   Do any of you have strong feelings either for or against a party who brings a lawsuit?

7.   This is a civil case which is to be decided by the preponderance of the evidence [clear and convincing on some issues]. This is different from a criminal case where the government has to prove its case beyond a reasonable doubt. Does anyone have a problem applying a lower burden of proof than used in a criminal case?

8.   Have any of you or members of your family been a party or witness in any litigation (excluding domestic relations, traffic, or probate)?

9.   Do any of you or any of the members of your family have any legal training?

10.   Have any of you worked for a car manufacturer or dealership?

11.   Do any of you now or have you previously owned a Daewoo Leganza or Daewoo vehicle?

12.   Do any of you know anything about a Daewoo vehicle?

13.   Have any of you read articles about the Daewoo vehicle?

14.     Have any of you or your family or close friends ever been sued or had a claim made against you?

15.     Does any member of the panel believe that a person should not be held responsible for the consequences of his or her own negligence if that negligence injures them or someone else?

16.     Does any member of the panel believe that merely because a person is injured that someone else must be at fault for that injury?

17.     Has any member of the panel, or any members of your family or close friends, to your knowledge, ever had any connection or dealings with any persons named so far, including the parties, witnesses or attorneys?

18.     Have you or a family member been involved in a rollover accident?  If so, were they injured?  How seriously?  Was the roof of the vehicle crushed?  Did the side windows shatter out of the vehicle?  Did the seatbelt work properly?

19.     Does anyone disagree with this statement: Auto manufacturers should exercise reasonable care in design of its vehicle to avoid subjecting a user of the vehicle to unreasonable risk of injury while using their vehicles?

20.     Do any of you have any opinion whether or not autos, such as sedans, should be equipped with laminated glass versus tempered glass?

21.     Does anyone on the panel have an opinion whether or not autos, such as sedans, should be equipped with a roof that does not crush into the occupant space during a rollover accident?

22. Has any member of the panel ever sustained a personal injury or had a relative who sustained injuries or death as a result of a motor vehicle accident? Were you injured? If so, explain the nature and extent of the injuries and damages.

23. Has any member of the panel ever been involved in a single vehicle accident? Were you injured? If so, explain the nature and extent of the injuries and damages.

24. Has any member of the panel ever been involved in a lawsuit or a claim as a result of injuries, death, and/or damages to yourself or a relative that were sustained in a motor vehicle accident? If so, how was the lawsuit resolved?

25. The plaintiffs in this case are seeking more than $32,000,000 in damages. Are there any of you who could not award that amount, no matter what the evidence showed?

26. The plaintiffs are seeking damages for pain, discomfort, suffering, disability, disfigurement, and anxiety for past and future loss of consortium – loss of love, care, affection, companionship, and other pleasures of the marital or family relationship, lost earnings, reasonable expenses of necessary medical care, treatment and services rendered, and reasonably probable to be incurred in the future, loss of enjoyment of life, and the wrongful death of Dolores Pacheco. Do any of you believe that damages should not be awarded for pain?

27. Do any of you believe that damages sought by a plaintiff in a lawsuit should be capped at a certain amount, regardless of the evidence? If so, what should the cap be and why do you feel this way?

28. Have you or any family member ever been employed in the following professions:

medical field (such as physician, nurse or paramedic); private investigation; law enforcement (such as a police officer, state police, or sheriff's deputy), or legal field (such as a lawyer, paralegal or secretary)?

29. Have you or any of your family members had a job that involved accident reconstruction, biomechanical work or the design of products?

30. Have any members of the panel driven on Mexican highways? If so, do you drive on Mexican highways with any regularity?

31. Have you or any of your family members ever suffered any type of spinal injury? If so, did it require continuing care?

32. Has anyone on the panel ever been disabled and unable to work for a period of time?

33. Have you or any member of your family been required (by job or family circumstance) to provide daily care for a severely injured person?

34. Does any member of the panel have any feelings, whether they be positive or negative, about products or vehicles manufactured in Korea?

35. Does any member of the panel believe that a motor vehicle should be designed in such a way that any occupant in any accident should be uninjured?

36. Does any member of the panel have any negative feelings about the automotive industry in general?

37. I will instruct you on the law at the conclusion of the case. If selected as a juror, you will take an oath to follow the law. Do any of you think you would have trouble following the law if you disagree with it?

38.  Ladies and gentlemen, we recognize that jury service is probably an inconvenience for you, taking you away from your jobs and families and disrupting your daily routine. Jury service is, however, one of the most important duties that citizens of this country can perform. For this reason, from time to time we ask citizens to make sacrifices and serve on juries, even when inconvenient. Prospective jurors can be excused from jury service if the length of the trial or the daily schedule would impose undue hardship. By undue hardship I mean more than inconvenience – I mean genuine hardship that would be experienced by you or your family. This case is expected to last ___ days. Would the length of the trial create an undue hardship for any of you?

39.  I expect to conduct trial on these dates and times:

_____

_____

_____

_____

Would this schedule create an undue hardship for any of you?

40.  Do any of you have any other reason whatsoever, such as a physical difficulty, a health problem or home problems that might interfere with your serving as a fair and impartial juror in this case?

41.  We have handed you a sheet with 10 separate questions. Please stand and answer the questions. The last question asks about your prior jury service. With respect to any

juries on which you have served, please indicate the nature of the case and the outcome of the trial.

42.     Did any of you know each other before this morning?

43.     If there are any matters that you would rather discuss privately that may affect your ability to be a fair and impartial juror, please let the Court know.

1.    Juror Number

2.    The general location of your residence

3.    Length of time at current residence

4.    Education after high school, if any.  State your major

5.    Marital status

6.    Number of children.  Ages of children if under 18

7.    Employment

     A.    Yourself – current job and types of jobs throughout lifetime

     B.    Spouse – current job and types of jobs throughout lifetime

8.    Civil, social, fraternal, union or professional organizations.  Offices held in them

9.    Hobbies or recreational activities

10.   Prior jury service – civil or criminal